948 P.2d 604

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Amir BOROCHOV, Defendant–Appellant.**

**No. 18016.**

Intermediate Court of Appeals of Hawai'i.

Oct. 31, 1997.

As Amended Nov. 6, 1997.

Dwight C.H. Lum, on the briefs, Honolulu, for defendant-appellant.

James H.S. Choi, Deputy Prosecuting Attorney, City and County of Honolulu, on the brief, Honolulu, for plaintiff-appellee.

Before WATANABE, ACOBA and KIRIMITSU, JJ.

ACOBA, Judge.

We hold that in Hawai'i Revised Statutes (HRS) § 708–830(6)(a) (1985) the phrase "whether from the property or its proceeds or from the [defendant's] own property reserved in equivalent amount" qualifies the defendant's obligation to make a specified payment or other disposition from property he or she obtained, and, therefore, describes part of the attendant circumstances of the theft offense defined under subsection (6)(a).

Because the indictment in the instant case charged the theft offense defined under HRS § 708–830(6)(a) but omitted this phrase, the indictment was defective for failing to allege all essential elements of the offense charged. Therefore, we vacate the April 6, 1994 judgment of conviction and sentence imposed on Defendant–Appellant Amir Borochov (Defendant) for theft in the first degree.

I.

A.

On September 4, 1991, Stephen Kinney (Kinney) received an 8.56 carat "round brilliant" diamond for consignment sale from his client and the owner of the diamond, George Williams (Williams). On October 18, 1991, Kinney also received a 5.66 carat "round brilliant" diamond from Williams for consignment sale.

On November 21, 1991, Kinney transferred possession of the diamonds to Defendant, who owned a diamond business known as ABC Diamonds. Defendant had represented that a "David," later identified as David Zuriano (Zuriano), could take the diamonds from Honolulu to Los Angeles to show to Zuriano's "boss" "who had expressed an interest in purchasing the stones."

Upon receiving the diamonds, Defendant executed and signed an ABC Diamonds pre-

printed memorandum form (memorandum)[1] and gave a copy of it to Kinney. The memorandum, which specified it was "from" Kinney, stated the following:

> The goods described and valued below are delivered to you in shop condition for EXAMINATION AND INSPECTION ONLY and are not on sale or return or constitute an offer to you to purchase. *The goods remain our property subject to our order and shall be returned to us immediately after examination and inspection or on demand and until returned to us* and actually received *you will take all strict precautions as to the safety and security of all the goods and bear all consequences for loss, theft, damage, or otherwise. You have NO RIGHT OR POWER TO SELL, PLEDGE, HYPOTHECATE, OR DEAL with the goods in any manner whatsoever.* If you wish to purchase all or any of such goods, our Invoice or Sale Note will be rendered after mutual agreement as to price and terms of sale thereof.
>
> . . . .
>
> Received the above goods in good order on the terms and conditions set out (This is NOT an invoice or bill of sale.) *Merchandise described above is on a 3[-]day consignment or memo.*

(Emphases added.) The memorandum also established the value of the 8.56 carat diamond at $32,000 and the 5.61[2] carat diamond at $25,000.

At trial, Defendant testified that after receiving the diamonds from Kinney, he discovered that Zuriano would be in Hawai'i for the weekend. Defendant thus decided to mail the diamonds to Los Angeles via registered mail. Defendant explained that on November 22, 1991, he mailed the diamonds to Meirov Brothers, a Los Angeles jeweler with whom Zuriano was supposedly associated. A xerox copy of the domestic return receipt, the receipt for registered mail, and the post office receipt dated November 22, 1991 to "Meirov Bros." in Los Angeles, California, were received in evidence. The return receipt showed that it was received on November 27, 1991 and signed by a person whom Defendant believed to be a secretary of Meirov Brothers.

Defendant also represented that on November 27, 1991, Zuriano apprised him of someone who was interested in purchasing the diamonds if Meirov Brothers would not buy the stones for $42,000. According to Defendant, Kinney approved the sale.

Kinney, instead, disclaimed any "agreement" to sell the diamonds but admitted knowing of the $42,000 offer. Kinney also related that Williams had agreed to the sale when Kinney first discussed it with him. Williams, however, denied discussing the offer with Kinney and denied approving the sale.

On Friday, November 29, 1991, Defendant issued a check to the order of Kinney Enterprises in the amount of $5000. Kinney asserts that the check was a "good faith" deposit for the diamonds. Defendant, on the other hand, viewed the check as a "deposit as a down payment."

Kinney attempted to "cash" the check that day but was unable to do so because of insufficient funds in Defendant's account. Defendant then suggested Kinney negotiate the check on the following Monday, December 2, 1991. Kinney attempted to collect the check proceeds on that date, but again was unable to do so because of Defendant's insufficient account.

After learning that the diamonds were purportedly in Los Angeles, Williams, on or about December 3, 1991, demanded they be

---

1. When questioned as to why a pre-printed memorandum of Defendant–Appellant Amir Borochov (Defendant) was used instead of a memorandum of Stephen Kinney (Kinney), Kinney responded that Defendant's "memorand[um] was actually better under the circumstances in terms of the conditions on the memorand[um] itself."

2. The memorandum between Defendant and Kinney describes one of the diamonds as 5.61 carats. However, the actual carat weight of the diamond was previously determined to be 5.66 carats by Scientific Gemological Labs, Inc. Kinney stated that the gemological report given to him by George Williams indicated the carat weight of the diamond to be 5.66. Kinney testified that the 5.66 carat diamond is the same diamond that is referenced as 5.61 carats in the November 21, 1991 memorandum between himself and Defendant.

returned. Kinney communicated Williams's demand to Defendant. Defendant notified Kinney that Zuriano would be returning to Honolulu on December 4 and that Zuriano would have the diamonds with him.

However, on December 5, Defendant explained that Zuriano had not returned with the diamonds but with "two business checks for the purchase price that [they] had been negotiating." Kinney asked to see the checks but Defendant never showed the checks to him.

Defendant related that on the evening of December 5, Zuriano presented him a check for only $7000 and told him "he had not collected the $42,000 yet," and that Defendant "would have to buy some time."

As a "good faith measure," Defendant offered Kinney the $42,000 on the condition that the money would be returned after the diamonds were received by Williams. Defendant and Kinney agreed to meet at a bank where Defendant would give Kinney the $42,000. Defendant failed to appear at the designated time.

Kinney requested that Defendant make arrangements for Defendant's "buyer" to return the diamonds to Williams's wife at the Beverly Wilshire Hotel in Los Angeles. Under this plan, Williams would meet his wife after he arrived in Los Angeles, retrieve the diamonds from her, "and all [of] this [would] be resolved." Defendant concurred in these arrangements. On December 6, 1991, Williams went to Los Angeles but never received the diamonds.

Kinney testified that after placing some telephone calls for the purpose of discovering Defendant's "sources," he was given the name of Benny Meirov (Meirov). Kinney called Meirov, who in turn advised Kinney that he knew about the diamonds, that Defendant had sold them and had been paid, and that Meirov was not the buyer.

Defendant consented to a conference call between his buyer and Kinney, but the call did not transpire because Defendant was "[un]able to reach" the buyer.

On December 9, Defendant showed Kinney a copy of a deposit slip reflecting that $42,000 had been deposited in Defendant's account, but Defendant refused to produce a copy of the original deposit slip or a copy of the "deposit and status report" to verify the deposit. Defendant admitted that he did not have the required amount in his bank account and that he "wrote two checks totalling $42,000" when he had no money in his account.

On that same day, Defendant issued a check to Kinney for $20,420 as a "good faith" deposit. Kinney attempted to negotiate this check on December 10th and 11th but was again unable to do so because of insufficient funds.

Reynold Hirazumi (Hirazumi), an expert witness for Plaintiff–Appellee State of Hawai‘i (the State), opined that the aggregate value of the diamonds was $28,430. Hirazumi also indicated that in the latter part of 1991, Defendant had offered to sell the diamonds to him for $28,000.

The diamonds were never returned to Kinney nor was any payment received by Kinney in exchange for the diamonds.

### B.

On June 8, 1993, the grand jury presented and filed an indictment against Defendant. The indictment read as follows:

> On or about the 21st day of November, 1991, to and including the 10th day of December, 1991, in the City and County of Honolulu, State of [Hawai‘i], [Defendant] did intentionally obtain property from [Kinney], the value of which exceeds Twenty Thousand Dollars ($20,000.00), *upon an agreement, or subject to a known legal obligation, to make specified payment or other disposition* to [Kinney], *and dealt with the said property as his own and failed to make the required payment or disposition* to [Kinney], thereby committing the offense of Theft in the First Degree, in violation of [HRS §] 708–830.5(1).

(Emphases added.)

Defendant did not challenge the validity of the indictment during the trial.

In its opening statement, the State indicated that Defendant and Kinney entered into "a contractual agreement" on November 21,

1991 and that under this "contract," "[t]he diamonds were to be [delivered to Defendant] for the sole purpose of examination and inspection only." The State stated that "to this date not a dime has come in on this[,] [n]or ha[ve] the diamond[s] been returned."

In its closing argument, the State told the jury that the State had to prove the "four essential elements" of the offense charged beyond a reasonable doubt, the first of which was, "Did the defendant obtain property upon an agreement or subject to a known legal obligation?" The State responded to its own question by stating, "That's clear. *That's the checks one, two checks* and this memorandum. That's a legal obligation. Tie 'em [sic] all together he's locked in on that. His signature is there." (Emphasis added.) Defense counsel did not object to this part of the State's closing argument.

The court instructed the jury on the elements of theft in the first degree in the following way:

> The Defendant is charged with the criminal offense of Theft in the First Degree.
>
> A person commits the crime of Theft in the First Degree if he [or she] intentionally obtains property from anyone, *upon an agreement, or subject to a known legal obligation, to make specified payment or other disposition, and dealt with the said property as his [or her] own, and failed to make the required payment or disposition of the property,* the value of which exceeds [$20,000].
>
> There are four material elements to the criminal offense of Theft in the First Degree, each of which must be proven by the prosecution beyond a reasonable doubt.
>
> 1. The Defendant did obtain property upon an agreement, or subject to a known legal obligation, to make specified payment or other disposition.
>
> 2. The Defendant dealt with the property as his own and failed to make the required payment or disposition.
>
> 3. The Defendant did so intentionally.

> 4. The value of the property exceeded [$20,000].

(Emphasis added.)

Defendant did not object to this instruction.

The court also instructed the jury that "[a] completed check which is drawn on a bank is a written commercial instrument which affects a legal right, interest or obligation." This instruction was originally objected to by Defendant, but the objection was withdrawn.

On February 16, 1994, the jury returned a verdict against Defendant.

On appeal, Defendant raises numerous issues. We need examine only two of them.

### II.

 First, Defendant contends the indictment was "fatally defective" for failing to set forth the essential elements of the offense.

Defendant was charged with committing theft in the first degree in violation of HRS § 708–830.5(1) (Supp.1992). HRS § 708–830.5(1)(a) states: "**Theft in the first degree.** (1) A person commits the offense of theft in the first degree if the person commits theft: (a) of property or services, the value of which exceeds $20,000."

Theft itself, however, is defined in different ways. *See* HRS § 708–830. While the indictment makes no reference to HRS § 708–830(6)(a), the language of the indictment is couched in terms of the theft definition contained in that section. HRS § 708–830(6)(a) states, in pertinent part, as follows:

> **Theft.** A person commits theft if the person does any of the following:
>
> . . . .
>
> (6) Failure to make required disposition of funds.
>
> (a) [A person] intentionally obtains property from anyone upon an agreement, or subject to a known legal obligation, to make specified payment or other disposition, *whether from the property or its proceeds or from the person's own property reserved in equivalent amount,* and deals with the property as [the person's] own and fails to make the

required payment or disposition. It does not matter that it is impossible to identify particular property as belonging to the victim at the time of the defendant's failure to make the required payment or disposition.

(Emphasis added.)

As may be discerned from a comparison of HRS § 708–830(6)(a) and the indictment, the charging language tracked the operative words of HRS § 708–830(6)(a) except for the omitted phrase, "whether from the property or its proceeds or from the person's own property reserved in equivalent amount."

Defendant argues that the omitted language constituted an "essential element" of the offense charged and therefore should have been pleaded in the indictment. The State, on the other hand, maintains that the statute is concerned only with "the failure 'to make specified payment or other disposition' depending upon the terms of the agreement or the known legal obligation under which the subject property was obtained, and *regardless of what the source of the agreed-to-payment or other disposition may have been.*" (Emphasis added.) As such, the State's position is that the language in HRS § 708–830(6)(a) which was omitted from the indictment did not describe an essential element of the type of theft charged.[3]

If it describes part of the essential elements of the offense, as Defendant contends, the phrase must refer to the attendant circumstances which must be proved by the State. Under the Hawai'i Penal Code "[t]he elements of an offense are [described as]: 'such (1) conduct, (2) *attendant circumstances,* and (3) results of conduct, as: (a) Are specified by the definition of the offense, and (b) Negative a defense[.]' " HRS § 702–205 (1993) (emphasis added); *cf. State v. Merino,* 81 Hawai'i 198, 214, 915 P.2d 672, 688 (1996) (holding that the fact that the value of property exceeded a certain amount was a "specified circumstance attendant to the underlying predicate offense—theft in the first degree—regarding the value of the property in question"); *State v. Wallace,* 80

Hawai'i 382, 414, 910 P.2d 695, 727 (1996) (designating the weight of illegal substances as the "attendant circumstance of requisite quantity" for conviction). For the reasons stated below, we believe the State must prove the attendant circumstance that Defendant's obligation to make a specified payment or other disposition was to be from one of the three sources specified in HRS § 708–830(6)(a).

A.

Our appellate courts " 'have consistently adhered ... to the rule of strict construction of penal statutes.' " *State v. Buch,* 83 Hawai'i 308, 327 n. 7, 926 P.2d 599, 618 n. 7 (1996) (quoting *State v. Smith,* 59 Haw. 456, 461, 583 P.2d 337, 341 (1978)); *State v. Ganal,* 81 Hawai'i 358, 373, 917 P.2d 370, 385 (1996) ("[A]s a general rule, '[p]enal statutes are to be strictly construed.' ") (quoting *State v. Ortiz,* 74 Haw. 343, 352, 845 P.2d 547, 552, *reconsideration denied,* 74 Haw. 650, 849 P.2d 81 (1993)); *State v. Kwak,* 80 Hawai'i 291, 295, 909 P.2d 1106, 1110, *vacated in part on other grounds on reconsideration,* 80 Hawai'i 297, 909 P.2d 1112 (1995); *Ortiz,* 74 Haw. at 352, 845 P.2d at 552; *State v. Burgo,* 71 Haw. 198, 202, 787 P.2d 221, 223 (1990); *see also State v. Marcotte,* 418 A.2d 1118, 1123 (Me.1980) (applying strict statutory construction to a Maine penal statute similar to HRS § 708–830(6)(a)). Applying the rule of strict construction, we believe a plain reading of the statute confines its application to instances where the defendant's agreement or obligation to make a "specified payment or other disposition" is from one of three sources: (1) the property obtained by the defendant; (2) the proceeds of the property obtained; or (3) the defendant's "own property reserved" for the required payment or other disposition. *See* Commentary to HRS §§ 708–830 to 708–833.

■ When applying this rule, however, we may also consider "precedent, legislative history, and common sense[,]" for " 'the strict construction rule does not permit the court to

---

**3.** Although not cited by Plaintiff-Appellee State of Hawai'i, Hawai'i Revised Statutes (HRS) § 806–27 (1993), states that "[n]o indictment

shall be held invalid or insufficient for want of the averment of any matter unnecessary to be proved[.]"

ignore legislative intent, nor require the court to reject that construction that best harmonizes with the design of the statute or the end sought to be achieved.'" *State v. Gaylord,* 78 Hawai'i 127, 138–39, 890 P.2d 1167, 1178–79 (1995) (quoting *Ortiz,* 74 Haw. at 352, 845 P.2d at 552) (construing HRS § 708–830(6)(a) strictly in the context of legislative intent). Hence, although it is not direct evidence of legislative intent, we may look to the commentary to validate our interpretation of HRS § 708–830(6)(a). *Gaylord,* 78 Hawai'i at 139, 890 P.2d at 1179 (citing HRS § 701–105 (1985)).

### B.

The commentary to HRS § 708–830(6)(a), however, only briefly reiterates what is stated in the statute itself. *See* Commentary to HRS §§ 708–830 to 708–833. But because the Model Penal Code and Commentaries (Official Draft and Revised Comments 1980) (MPC), as adopted at the 1962 annual meeting of The American Law Institute, was used as a guide for the Judicial Council of Hawai'i in drafting the Hawai'i Penal Code (HPC), "'we [may also] look to the MPC and its comments to inform our effort to glean the scope of' parallel statutes contained in the HPC." *Gaylord,* 78 Hawai'i at 140 n. 22, 890 P.2d at 1180 n. 22 (quoting *In re Doe, Born on January 5, 1976,* 76 Hawai'i 85, 95, 869 P.2d 1304, 1314 (1994)).

We therefore focus on MPC § 223.8, which is nearly identical to HRS § 708–830(6)(a) [4] and provides, in relevant part:

A person who purposely obtains property upon agreement, or subject to a known legal obligation, to make specified payment or other disposition, *whether from such property or its proceeds or from his own property to be reserved in equivalent amount,* is guilty of theft if he [or she] deals with the property obtained as his [or

her] own and fails to make the required payment or disposition.

MPC § 223.8, at 255 (emphasis added).

The comment to MPC § 223.8 discloses that the drafters' objective was to differentiate conduct which "arguably constitutes merely a breach of contract" from the criminal "misappropriation of property of another." *Gaylord,* 78 Hawai'i at 140, 890 P.2d at 1180. Thus, "[MPC §] 223.8 recognizes that in some situations one who promises to make certain payments or other disposition of property should be punished [criminally] for dealing with the property as his own." MPC § 223.8 comment at 256.

The difficulty, however, "is to distinguish default that should be assimilated to theft from nonperformance that should be left to the traditional remedies for breach of contract." *Id.* Similarly, the HPC recognizes that "[c]ourts have had difficulty in regarding this type of wrongful appropriation as theft because it arises out of a breach of a civil contractual obligation." Commentary to HRS §§ 708–830 to 708–833.

In attempting to distinguish conduct which should be treated as theft rather than as a breach of contract, the MPC drafters "emphasize" that "'[MPC §] 223.8 must not be construed so broadly that a bright line between theft and breach of contract is obscured.'" *Gaylord,* 78 Hawai'i at 140, 890 P.2d at 1180 (quoting MPC § 223.8 comment at 261).

The path to avoiding such undue extensions of [MPC §] 223.8 is to accord proper weight to the limitation embodied in the words "to be reserved," so that *[MPC §] 223.8 is deemed applicable only in cases of a promise to turn over property actually received in kind or an equivalent sum of money specifically reserved in the sense that a trustee reserves a fiduciary account.* It is true that such a construction would seem to limit [MPC §] 223.8 to classic instances of embezzlement[5].... But in

---

**4.** HRS § 708–830(6)(a) was formerly codified as HRS § 708–830(7)(a), which is referred to in note 24 to the comment to the Model Penal Code and Commentaries (Official Draft and Revised Comments 1980) (MPC) § 223.8, at 266 as "identical" to that MPC section.

**5.** Black's Law Dictionary states:

The elements of [embezzlement] are that there must be a relationship such as that of employment or agency between the owner of the money and the defendant, the money alleged to have been embezzled must have come into the possession of the defendant by virtue of that relationship and there must be an intentional

order to eliminate application of the section to cases where civil remedies alone should be permitted, *something approaching an explicit agreement to "reserve" would seem required.*

MPC § 223.8 comment at 261–62 (emphases added).

Hence, the MPC drafters suggest that the clause similar to that which was omitted from Defendant's indictment is key to maintaining such a distinction.

The commentary expressly recognizes that the essential elements of the offense described in MPC § 223.8 included the phrase omitted from Defendant's indictment.

The conduct proscribed under [MPC §] 223.8 consists of essentially two elements: (i) the obtaining of property upon an agreement or subject to a known legal obligation to make a specified payment or other disposition, *whether from the property obtained or its proceeds or from one's own property to be reserved in an equivalent amount;* and (ii) dealing with the property as one's own and failing to make the required payment or disposition.

*Id.* at 267 (emphasis added).

In their explanation, the drafters point out that a "narrow construction" of the clause would restrict the type of theft cases fitting into this category.

(b) *Agreement or Legal Obligation.* [MPC §] 228.8[sic][6] applies to one who takes the property upon agreement or legal obligation "to make specified payment or other disposition, whether from such property or its proceeds or from his own property reserved in equivalent amount."

As is noted in Comment 1, the extent to which ordinary contract law is invaded by [MPC § 223.8] will in large part be determined by the explicitness of the agreement and the extent to which a specific, fiduciary-like reservation is required. *It is plain that these words should be narrowly con-*

*strued so as to confine the operation of [MPC § 223.8] to cases that are distinguishable from violations of [MPC §] 223.2* [7] only in the sense that there may be difficulties as to the method of acquisition or control over the property.

Each of the codes and proposals that has adopted a provision comparable to [MPC § ] 223.8 includes the words "to be reserved in equivalent amount" or closely similar language, except for South Dakota. *These words would seem helpful to facilitate an appropriately narrow construction of this offense.*

*Id.* at 268 (footnote omitted) (emphases added).

## C.

Accordingly, we view the words "whether from the property or its proceeds or from his own property reserved in equivalent amount" as qualifying language which limits the application of HRS § 708–830(6)(a) to cases which plainly fit within the express terms of subsection (6)(a). Because this qualifying language aids in distinguishing conduct "that should be assimilated to theft" from "non-performance that should be left to the traditional remedies for breach of contract," MPC § 223.8 comment at 256, it is pivotal to the definition of the offense. Such language must therefore be part of the description of the essential elements of a HRS § 708–830(6)(a) theft "in order to eliminate application of the section to cases where civil remedies alone should be permitted." *Id.* at 262.

## D.

As previously mentioned, the MPC draws a distinction between the broad reach of MPC § 223.2 and the more restrictive application of MPC § 223.8.

MPC Section 223.2 provides:

§ 223.2 Theft by Unlawful Taking or Disposition

---

or fraudulent appropriation or conversion of the money.
Black's Law Dictionary 522 (6th ed.1990). *Cf. Territory v. Yim,* 39 Haw. 214 (1952).

**6.** Although the MPC comment refers to MPC § 228.8, it is apparent from the context of the

comment that the correct reference is to MPC § 223.8. This is also evidenced by the fact that there is no § 228.8 in the MPC.

**7.** *See infra* part D.

(1) *Moveable Property.* A person is guilty of theft *if he [or she] unlawfully takes,* or *exercises unlawful control over,* moveable *property of another with purpose to deprive him [or her] thereof.*

(2) *Immoveable Property.* A person is guilty of theft if he [or she] unlawfully transfers immoveable property of another or any interest therein with purpose to benefit himself[, herself,] or another not entitled thereto.

(Footnote omitted) (emphases added, except for subsection titles).

The comment to MPC § 223.2 explains that this type of theft "may ... be committed by an agent, bailee, trustee, fiduciary, or other person entrusted with possession of the property." MPC § 223.2 comment at 163. The drafters also state that the language " 'exercises unlawful control' applies at the moment the custodian of the property begins to use it in a manner beyond his authority and thus includes the typical embezzlement situation." *Id.* at 165–66.

HRS § 708–830(1) (1985) is comparable to MPC § 223.2 in its inclusive definition of theft: "§ 708–830 **Theft.** A person commits theft if [the person] does any of the following: (1) Obtains or exerts unauthorized control over property. [A person] obtains, or *exerts control over, the property of another with intent to deprive [the other]* of the property." (Emphasis added.)

As MPC § 223.2 is broader in scope than MPC § 223.8, so too is HRS § 708–830(1) with respect to HRS § 708–830(6)(a). The commentary relating to HRS § 708–830(1) provides, in pertinent part:

> *A wide range of behavior is included within this definition, from stealthily and covertly treating the property of another as one's own to blatantly snatching it from the person of the owner.* This definition contains elements of the traditional of-

fenses of larceny, embezzlement, and fraudulent conversion. And, unlike the case with traditional embezzlement statutes, the relation in which the actor stands to the victim is immaterial. Likewise, there are no limitations with regard to the trust involved in fraudulent conversion: the coverage includes property held by the actor in any capacity. All kinds of property, both real and personal, moveable and immovable, are included within this definition.

Commentary to HRS §§ 708–830 to 708–833 (emphasis added) (footnotes omitted).

Hence, one of the distinguishing factors between HRS § 708–830(1) and HRS § 708–830(6)(a) is that the latter encompasses only those instances where the defendant fails to make the required payment or other disposition from one of three specific sources. This distinction lends support to Defendant's argument in his brief that under HRS § 708–830(6)(a), the omitted language. "would have made it clear that the required payment or disposition had to be from either the diamonds, proceeds from the sale of the diamonds, or an equivalent sum which was reserved [by Defendant] in some kind of fiduciary account."

**E.**

That the omitted phrase is crucial to charge a HRS § 708–830(6)(a) theft is illustrated by *Marcotte.* There the supreme court of Maine considered "the significance of the statutory phrase 'from that property ... or from [their] own property *to be reserved* in an equivalent ... amount' " as found in Maine Revised Statutes Annotated title 17–A (Me.Rev.Stat.Ann.tit.17–A), § 358, (West 1983)[8] a penal provision derived from MPC § 223.8 and much the same as HRS § 708–830(6)(a). *Marcotte,* 418 A.2d at 1121.

---

**8.** Maine Revised Statutes Annotated title 17–A (Me.Rev.Stat.Ann.tit.17–A), § 358 (West 1983) provides, in pertinent part:

> Theft by misapplication of property
> 1. A person is guilty of theft if he [or she] obtains property from anyone or personal services from an employee upon agreement, or subject to a known legal obligation, to make a specified payment or other disposition to a 3rd

person or to a fund administered by himself [or herself], *whether from that property or its proceeds or from his [or her] own property to be reserved in an equivalent or agreed amount* if he [or she] intentionally or recklessly fails to make the required payment or disposition and deals with the property obtained or withheld as his [or her] own.

The defendants in *Marcotte* were indicted for theft because of the failure to remit sales taxes incurred in the course of a retail furniture business, under Me.Rev.Stat. Ann. tit. 17–A, § 358. *Id.* at 1119. The trial court, upon motion of the defendants, dismissed these counts for failure to allege an offense. *Id.* The trial court had reasoned that the sales tax was a personal debt of the retailer and not of the purchaser, and, therefore, criminal liability could not arise from the failure to pay such a civil obligation. *Id.*

The supreme court affirmed, finding that there could be no criminal liability unless there existed an "agreement or legal obligation to make payment from the property obtained or its proceeds or from property *to be reserved* in equivalent amount[.]" *Id.* at 1121.

This conclusion was reached after consideration of the 1962 proceedings of the American Law Institute discussing MPC § 223.8.[9] The court determined that "[t]he line had been drawn to limit criminal liability to those situations where a kind of trust or fiduciary obligation required an equivalent amount to be reserved." *Id.* Because it found that the defendant did not have a duty to segregate sales tax receipts, the court concluded that the defendant was not acting as a fiduciary or in a position of trust within the meaning of the clause at issue. *Id.* at 1121–22.

The holding in *Marcotte* was reiterated in *State v. Pleasant Hill Health Facility,* 496 A.2d 306 (Me.1985), where Maine's supreme court again recognized "that [Me.Rev.Stat. Ann. tit. 17–A], § 358 does not impose criminal liability ... where ... there exists 'no agreement or legal obligation to make payment from the property obtained or its proceeds or from property to be reserved in an equivalent amount.'" *Id.* at 308 (quoting *Marcotte,* 418 A.2d at 1121).[10]

### III.

■ In light of our belief that the prosecution must prove that Defendant was required to make payment or required disposition from one of the three sources referred to in HRS § 708–830(a)(6), we agree with Defendant that the failure of the court to include this attendant circumstance in its elements jury instruction was plain error.

Where plain errors are committed and substantial rights are affected, this court may recognize such errors although not brought to the attention of the trial court. Hawai'i Rules of Appellate Procedure Rule 52(b); *State v. Fox,* 70 Haw. 46, 55, 760 P.2d 670, 675 (1988); *State v. Iaukea,* 56 Haw. 343, 355, 537 P.2d 724, 733 (1975) ("[Appellate courts] have the power, *sua sponte,* to notice plain errors or defects in the record affecting substantial rights not properly brought to the attention of the trial judge or raised on appeal.").

■ We also agree that the court committed plain error in charging the jury that "[a] completed check ... is a written commercial instrument which affects a legal right, interest or obligation."

Because the court had also instructed the jury that an element of the theft charge was that Defendant "did obtain property ... *subject to a known legal obligation,* to make specified payment or other disposition," the combined effect of the two instructions could have misled the jury into assuming that the checks Defendant had written constituted the necessary "known legal obligation" required to be proved by the State. As we have set out, this was precisely the argument that the State made to the jury during closing arguments.

The evidence, however, is not in dispute that Defendant obtained the diamonds subject to the legal obligations set forth in the memorandum Defendant provided to Kinney. Indeed, on appeal the State contends that the memorandum was the binding legal obligation by which Defendant obtained the

9. Me.Rev.Stat. Ann. tit. 17–A, § 358 was based on the New Hampshire Criminal Code, § 637:10 which in turn was modeled on MPC § 223.8.

10. In *State v. Pleasant Hill Health Facility,* 496 A.2d 306 (Me.1985), the supreme court found that Pleasant Hill, by administering social security checks on behalf of its patients, had implicitly agreed to separate funds and hold such funds in trust. Therefore, Pleasant Hill was held criminally liable for commingling the trust funds with its own.

diamonds [11] or in the alternative that the subsequent alleged oral agreement between Defendant and Kinney to sell the diamonds amounted to an agreement or known legal obligation by which Defendant obtained the diamonds.

While we thus view the jury instructions as prejudicially misleading and would otherwise require that the case be remanded for a new trial, the defect in this prosecution was more fundamental because, as we have indicated, the indictment failed to include all the essential elements of the type of theft charged.

## IV.

■■■■ The failure to allege an essential element of an offense renders a charge fatally defective. *State v. Elliott,* 77 Hawai'i 309, 311–12, 884 P.2d 372, 374–75 (1994) (citing *State v. Jendrusch,* 58 Haw. 279, 567 P.2d 1242 (1977)); *see Merino,* 81 Hawai'i at 212, 915 P.2d at 686; *State v. Israel,* 78 Hawai'i 66, 73, 890 P.2d 303, 310 (1995). In *Elliott,* the court noted the following explication of this proposition in *Jendrusch:*

> The accusation must sufficiently allege all of the essential elements of the offense charged. This requirement obtains whether an accusation is in the nature of an oral charge, information, indictment, or complaint, and *the omission of an essential element of the crime charged is a defect in substance rather than form. A charge defective in this regard amounts to a failure to state an offense, and a conviction based upon it cannot be sustained,* for that would constitute a denial of due process. This requirement may not be waived or dispensed with, and the defect is ground for reversal, *even when raised for the first time on appeal.*

*Elliott,* 77 Hawai'i at 311, 884 P.2d at 374 (emphases added) (quoting *Jendrusch,* 58 Haw. at 281, 567 P.2d at 1244). Moreover, the requirement that all essential elements be alleged is not satisfied by the fact that the accused had actual knowledge of such elements and was not misled by the State's failure to sufficiently allege all of the essential elements of the offense charged. *State v. Tuua,* 3 Haw.App. 287, 293, 649 P.2d 1180, 1184–85 (1982).

■■■■ As a result, "[t]he failure of an [indictment] to charge an offense may be raised 'at any time during the pendency of the proceedings[.]' " *Merino,* 81 Hawai'i at 212, 915 P.2d at 686 (quoting Hawai'i Rules of Penal Procedure Rule 12(b)(2) (1995)). In *State v. Motta,* 66 Haw. 89, 91, 657 P.2d 1019, 1020 (1983), however, the supreme court indicated that if an indictment is challenged for the first time on appeal, an appellate court should "not reverse a conviction based upon a defective indictment unless the defendant can show prejudice or that the indictment cannot within reason be construed to charge a crime." Here, trial defense counsel failed to move to dismiss the indictment and Defendant premises one of his appeal points of ineffective assistance of counsel on this omission.

But, we need not determine the viability of this claim in relation to the "liberal construction rule" set down in *Motta* because the supreme court further concluded that a charge first challenged on appeal would still be "fatally defective" under the liberal construction rule if the charge were " 'so obviously defective that by no reasonable construction can it be said to charge the offense for which conviction was had.' " *Id.* at 93–94, 657 P.2d at 1021–22 (quoting *United States v. Thompson,* 356 F.2d 216, 226 (2d Cir.), *cert. denied,* 384 U.S. 964, 86 S.Ct. 1591, 16 L.Ed.2d 675 (1965)). Because we conclude, based on our foregoing discussion, that a reasonable construction of the indictment would not result in charging the essential elements of a HRS § 708–830(6)(a) theft, the indictment was "constitutionally insufficient" even though only challenged on appeal. *Id.*

## V.

Under our disposition of the case we need not reach Defendant's other points of error.

---

11. The State asserts that Defendant admitted at trial that the known legal obligation by which he obtained possession of the diamonds was based on the November 21, 1991 memorandum.

Q. [Prosecutor] So there's no dispute that this [memorandum] is a contract or a legal obligation that you accepted on November 21st?
A. [Defendant] Correct.

Accordingly, for the foregoing reasons, we vacate Defendant's April 6, 1994 judgment of conviction and sentence and remand the case to the court with instructions to dismiss the indictment.