228 P.3d 341

George MIYASHIRO, Plaintiff–Appellant,

v.

ROEHRIG, ROEHRIG, WILSON & HARA; Stanley H. Roehrig, Attorney at Law, ALC; Glenn Hara, Attorney at Law; Carol Miyashiro; Troy Miyashiro; Title Guaranty Co.; and Doe Defendants 1–100, Defendants–Appellees.

No. 28395.

Intermediate Court of Appeals of Hawai'i.

March 23, 2010.

David J. Gierlach, Honolulu, for Plaintiff–Appellant.

Peter Van Name Esser, Honolulu; Keith K. Hiraoka (Roeca, Louie & Hiraoka), Honolulu, and Brian J. De Lima (Crudele & De Lima) with him on the briefs, for Defendants–Appellees Roehrig, Roehrig, Wilson & Hara, Stanley H. Roehrig and Glenn S. Hara.

Diana L. Van De Car, Hilo, for Defendant–Appellee Title Guaranty Escrow Services, Inc.

FOLEY, Presiding Judge, LEONARD, J., and Circuit Court Judge TRADER, in Place of NAKAMURA and FUJISE, JJ., All Recused.

Opinion of the Court by LEONARD, J.

Plaintiff–Appellant George Miyashiro (**George**)[1] appeals from the Circuit Court of the Third Circuit's (**Circuit Court**) April 24, 2007 Second Amended Final Judgment.[2] On appeal, George seeks relief from five orders

---

1. As several members of the Miyashiro family are necessarily referenced in this Opinion, for the purpose of brevity and clarity, their first names are used.

2. The Honorable George M. Masuoka presided.

granting summary judgment against him and the Circuit Court's limitations on the role of George's *pro hac vice* counsel.

We hold: (1) the Circuit Court did not abuse its discretion when it denied a motion to remove agreed-upon limitations on *pro hac vice* counsel's role in this case; (2) the Circuit Court did not err in granting summary judgment in favor of an escrow company on the claim that escrow breached its contractual duty by delivering stock certificates in care of a party's attorney when the only address provided to the escrow company was in care of the party's attorney and the party executed a document that identified the address in care of the attorney as the party's address; (3) the Circuit Court erred in granting summary judgment on the Hawaiʻi Rules of Professional Conduct when, *inter alia,* there existed genuine issues of material fact in dispute concerning an attorney's implied authorization to disclose information related to the representation when the person to whom the disclosure was made had withdrawn her consent to a highly significant part of the agreement that was the subject of the attorney's representation; even when a disclosure of information may be impliedly authorized in the first instance, in the face of a significant change in circumstances, that authorization may be subject to limitations, and may give way to other duties, such as the duty to keep the client reasonably informed, reasonably advised, and in the decision-making role, including with respect to the means by which the client's objectives are pursued; (4) the Circuit Court erred in granting summary judgment on a bylaws provision controlling the transfer of shares of stock in a closely-held corporation when summary judgment was based on a determination that the bylaws required board of directors' consent for any stock transfer, but the bylaws do not require directors' consent and, instead, set forth a mandatory procedure whereby stock may be transferred; (5) the Circuit Court did not err in granting summary judgment on a conspiracy claim when the plaintiff failed to adduce evidence supporting each of the elements of an underlying criminal or unlawful purpose or criminal or unlawful means used to accomplish a lawful purpose; and (6) the Circuit Court erred in granting summary judgment based on a plaintiff's allegedly admitted embezzlement and breach of fiduciary duty when it appears from the record that there are genuine issues of material fact concerning the alleged misappropriations and concerning whether plaintiff necessarily would have been removed as president of the company and otherwise would have been divested of his interest in the company in the absence of his attorney's alleged breaches.

Accordingly, we affirm in part and vacate in part, and we remand this case for a trial on George's remaining claims.

## I.  BACKGROUND

In 1965, George's father Jack Miyashiro (**Jack**) established Jack's Tours, Inc. (**Jack's Tours**), a Hawaiʻi corporation that operates a touring business on the Big Island of Hawaiʻi.  In conjunction with Jack's retirement from Jack's Tours in 1988, Jack named George President of Jack's Tours.  George served as President and Chief Executive Officer of Jack's Tours from 1988 until January 1999.  Also upon his retirement, Jack gifted shares of stock in Jack's Tours, which were all previously owned by him, to George, George's brother Raymond Miyashiro (**Raymond**), Raymond's daughter Leslie Miyashiro (**Leslie**), and George's sons Jeff Miyashiro (**Jeff**) and Troy Miyashiro (**Troy**).  Between 1988 and 1998, George bought additional shares of stock from Jack. As of July 1998, George owned 28% of the outstanding shares of Jack's Tours, Raymond and Leslie owned or controlled 28%, collectively, and Jeff and Troy each owned 22% of the outstanding shares of Jack's Tours.

### A.  The Lawsuits involving Raymond

Beginning in 1997, various disputes developed between George and Raymond, who owned and operated another touring business, Trans Hawaiian, Inc. (**Trans Hawaiian**).  Trans Hawaiian operated primarily on the island of Oahu. George alleges that Trans Hawaiian owed a significant amount of money to Jack's Tours.  George avers that he sought to substantially reduce the debt owed by Trans Hawaiian to Jack's Tours and de-

clined to provide support services for Trans Hawaiian until the debt was reduced.

In 1997, Trans Hawaiian and the trustee of Raymond's trust initiated two lawsuits, one against Jack's Tours and the other against George, individually and in his capacity as an officer and director of Jack's Tours. George claims that these suits were brought in anticipation of his actions to reduce Trans Hawaiian's outstanding indebtedness to Jack's Tours. In Case No. 97–402, filed in the Circuit Court by Lance Castroverde, as Trustee for the Raymond Miyashiro Trust (**Raymond Trust**) and derivatively on behalf of Jack's Tours, it was alleged that George and/or others under his dominion or control constituted a majority of the board of directors of Jack's Tours, and provided unjustified payments and benefits to George, George's ex-wife Carol Miyashiro (**Carol**), Troy, and others (**97–402**). The complaint in 97–402 sought damages, an accounting, and other relief from George and Doe Defendants based on claims of breach of fiduciary duty, mismanagement, misappropriation, diversion and/or conversion of funds, unjust enrichment, theft and embezzlement, and fraud.

Trans Hawaiian filed a complaint against Jack's Tours in the District Court of the Third Circuit, Hilo Division, seeking $12,381.69 for unpaid transportation and related services and products. This case was transferred to the Circuit Court and numbered Case No. 97–471, upon the filing of a counterclaim by Jack's Tours alleging that Trans Hawaiian owed Jack's Tours approximately $150,000 for certain services and accommodations (**97–471**).

Although the cases were never consolidated, in mid–1998, 97–471 and 97–402 were settled in a joint settlement agreement. The terms of the settlements were put on the record before the Circuit Court on July 24, 1998. The parties agreed to settle both cases on the following terms:

1. All shares of stock in Jack's Tours, Inc., owned or controlled by Raymond Miyashiro or his daughter Leslie shall be transferred to George Miyashiro or, per his directions, in consideration for the payment in full of the sum of $300,000.00, to Raymond Miyashiro or his designee. Such a transfer is contingent on George obtaining PUC approval as required by law or PUC order. Raymond will cooperate in obtaining such approval.

2. Civil No. 97–402, *Castroverde v. Miyashiro,* shall be dismissed with prejudice, with each party to bear their own attorneys [sic] fees and costs.

3. The appropriate corporate approval for the sale and transfer of stock as provided for herein by Jack's Tours, Inc., shall be presented to Raymond Miyashiro within 15 days of the Court's approval or as otherwise agreed by the parties.

4. Civil No. 97–471, *TransHawaiian Services, Inc. v. Jack's Tours, Inc.,* shall be dismissed with prejudice, with each side to bear their own attorneys [sic] fees and costs. It is expressly understood and agreed that the Counterclaim of approximately $150,000.00 by Defendant Jack's Tours, Inc., against Plaintiff TransHawaiian Services, Inc., shall be forever barred through this dismissal.

5. Jack's Tours, Inc., shall provide services of a retail value of up to $300,000.00 to TransHawaiian Services, Inc., its nominee, or designee during a 3–year time period. In the event that ownership of Jack's Tours, Inc., is transferred, or Jack's Tours, Inc., wishes to terminate this provision, it shall be allowed to do so by paying the remaining value of the services, less a 24% deduction. For so long as there shall be a balance outstanding pursuant to this provision, in the event that Jack's Tours, Inc., desires to sell the majority shares of its stock or a controlling interest of its ownership rights, TransHawaiian Services, Inc., or Raymond Miyashiro shall have first the right to match or equal any bona fide offer to purchase presented to Jack's Tours, Inc., or any of its stockholders, officers, or directors, and upon matching or equaling the proposed purchase price, the seller shall be obli-

gated to transfer said interest to Raymond Miyashiro or TransHawaiian Services, Inc.

6. The appropriate corporate actions necessary to effectuate the terms and conditions herein shall be presented within 15 days of the Court's approval of this settlement.

7. The terms and conditions herein shall bind the heirs, successors and assigns of the parties hereto.

8. This Court shall retain jurisdiction over this matter for purposes of assuring compliance with the terms and conditions of this settlement by the parties to this litigation. Any party may move this matter for consideration by this Court upon appropriate notice to the other party. The decision of the Court shall be binding and non-appealable.

9. An appropriate escrow will be established to handle this transaction. The parties shall provide appropriate escrow instructions.

B. *The Escrow Transaction*

On or about October 2, 1998, George and the Raymond Trust entered into an escrow agreement, designating Defendant–Appellee Title Guaranty Escrow Services, Inc. (**Title Guaranty**) as the escrow agent for the transfer of stock certificates to George and the payment of $300,000.00 to the Raymond Trust. The escrow instructions prepared and signed by the parties provided the following directions to Title Guaranty for the closing of the escrow transaction:

These escrow instructions are agreed upon and issued jointly by Lance Castroverde, Trustee of the Raymond Miyashiro Trust, and George Miyashiro, Individually and as President of Jack's Tours, Inc., with regard to the transfer of shares of stock in Jack's Tours, Inc., held by Lance Castroverde as Trustee of the Raymond Miyashiro Trust to George Miyashiro or his designee. It is agreed that Title Guaranty shall act as escrow for this transaction.

This transfer is made pursuant to the terms and provisions of that settlement agreement between the parties in Civil No. 97–402 as set forth in that certain "Script

for Placing Terms of Settlement on the Record–July 22, 1998" a copy of which is attached hereto.

1. No later than five (5) days prior to the closing date set forth herein, George Miyashiro shall deposit the sum of Three Hundred Thousand Dollars ($300,000.00) with escrow to be distributed in accordance with these instructions;

2. No later than five (5) days prior to the closing date set forth herein Lance Castroverde shall present to escrow his letter dated September 3, 1998, to Matthew S.K. Pyun, Esq., indicating that the Public Utilities Commission has received the notification of this transfer of shares and no further action is anticipated;

3. No later than five (5) days prior to closing, George Miyashiro as President of Jack's Tours, Inc., shall deposit with escrow all stock certificates of Jack's Tours, Inc., owned or controlled by Lance Castroverde as Trustee of the Raymond Miyashiro Trust, Raymond Miyashiro and Leslie Miyashiro. It is expressly understood that no other shares owned by Lance Castroverde as Trustee of the Raymond Miyashiro Trust, Raymond Miyashiro and Leslie Miyashiro shall remain outstanding;

4. At or prior to closing Lance Castroverde as Trustee of the Raymond Miyashiro Trust, Raymond Miyashiro and Leslie Miyashiro shall as necessary execute all stock certificates to be transferred to George Miyashiro, and shall deposit with escrow a certification that any shares transferred are free and clear of any encumbrances or liens.

At closing escrow shall:

5. Escrow shall close this matter on October 19, 1998;

6. Pay to the Raymond Miyashiro Trust the sum of Three Hundred Thousand Dollars ($300,000);

7. Deliver to George Miyashiro the duly executed stock certificates of Jack's Tours, Inc.;

8. Deliver to George Miyashiro the certification of Lance Castroverde as Trustee of the Raymond Miyashiro Trust, Raymond Miyashiro and Leslie Miyashiro, that the transferred shares are free and clear of any liens or encumbrances;

9. Deliver to each party a copy of Lance Castroverde's letter to Matthew S.K. Pyun, Jr., Esq., dated September 3, 1998, indicating that the Public Utilities Commission has been duly notified of the transfer of the shares of stock;

10. Escrow shall be authorized to make any delivery as provided herein to the authorized representative of the parties provided that a duly executed written authorization is provided escrow prior to or at closing;

11. Collect one-half (½) of its fees from each of the parties.

On or about October 7, 1998, a letter from Defendant–Appellee Stanley H. Roehrig (**Roehrig**) was hand-delivered to Title Guaranty. The letter stated:

Please accept this as a supplemental escrow instruction with regard to the above escrow. My client, Jack's Tours, Inc. has authorized me to hold for safekeeping, any and all shares of stock of Jack's Tours, Inc., at the close of escrow, in order to work out further family details.

The October 7, 1998 letter was signed by Roehrig, but was not signed or countersigned by George. Roehrig claims that George told him to hold Raymond's shares after the closing of the Title Guaranty escrow. Although the letter reflects a "cc" to George, Raymond's attorney, and George's ex-wife Carol, George denies authorizing the letter or receiving a contemporaneous copy.[3] As discussed further herein, George strongly denies authorizing Roehrig to hold the stock certificates after the closing of escrow. The record contains no written agreement, letter, memo, fax, note, email, or other writing signed by George that evidences George's approval of the supplemental escrow instruction.[4]

However, on or about October 15, 1998, a Tentative Buyer's Statement was generated by Title Guaranty. This statement provides an address "C/O ATTORNEY STANLEY H ROEHRIG" for both George and Jack's Tours. George's undated signature appears on the second page of the statement, acknowledging its receipt.

Escrow closed on October 19, 1998. The stock certificates were sent by Title Guaranty to "MR. GEORGE MIYASHIRO PRESIDENT JACK'S TOURS INC." "C/O ATTORNEY STANLEY H. ROEHRIG[.]" Roehrig claims that, with George's approval, the shares were given to Roehrig "in trust, pending a decision of the [Jack's Tours] directors on how the shares would be allocated." George claims that Roehrig wrongfully redirected the stock certificates to himself and wrongfully withheld them from George. The record contains no written agreement, letter, memo, fax, note, email, or other writing signed by George that evidences George's approval of the purported trust arrangement.

## C. The Attorney–Client Relationship

There are numerous points of material disagreement between George and Roehrig regarding the nature and scope of their relationship. Both parties agree, however, that there was an attorney-client relationship formed between George and Roehrig and

---

3. The record also contains an October 6, 1998 letter from Roehrig's legal assistant, stating that Roehrig was representing George and Jack's Tours. The October 6, 1998 letter did not reflect a "cc" to George.

4. It appears, however, that someone at Jack's Tours received a copy of Roehrig's October 7, 1998 letter because, on October 13, 1998, Donald Bowers of Jack's Tours faxed a copy of the letter back to Roehrig with a handwritten note stating, "George said all 28% is his" and "Carol will have to wait until he is dead." Also on October 13, 1998, Donald Bowers sent another fax to Roehrig with the message, "George Keeps [sic] telling me to let you know The [sic] stock is his and he don't [sic] want to split with anyone." At deposition, Roehrig testified that, on October 14, 1998, George told him, "I'm going to do it" and then deposited $300,000.00 into escrow.

that this relationship was memorialized in an engagement letter. The engagement letter, dated September 15, 1997, was addressed to George, individually, without reference to any corporate capacity or to Jack's Tours. The letter states that "this firm's representing you in matters generally concerning your personal and business affairs," is signed by Roehrig, and is countersigned by George. The letter contains no discussion of the representation or possible representation of multiple clients (such as George and Jack's Tours), multiple roles (such as Roehrig acting as a trustee or stakeholder, as well as lawyer), or any disclosure or explanation of the implications, advantages, or risks of common representation. The letter does not purport to waive any conflicts of interest or potential conflicts of interest. It appears from the record that the engagement agreement set forth in the September 15, 1997 letter was never amended or supplemented. There were no subsequent conflict waivers, Roehrig's position being (as stated at oral argument) that no conflict waiver was needed in this case, and George's position being that Roehrig breached his ethical and professional duties to his client.

George contends that Roehrig was never authorized to represent any interest other than George's individual interests. George states that he initially retained Harold Chu, Esq., to serve as the attorney for both Jack's Tours and George in 97–402 and 97–471, but that a conflict of interest arose requiring separate representation. George further states that he hired Roehrig to act as his personal attorney in 97–402. On July 24, 1998, when the settlements in 97–402 and 97–471 were put on the record before the Circuit Court, Harold Chu stated that he represented Jack's Tours in 97–471 and Roehrig stated that he represented George in 97–402.

Roehrig claims that he was hired to represent George against Raymond and Trans Hawaiian, both personally and as president of Jack's Tours.[5] Roehrig points to a second September 15, 1997 letter from George to various attorneys notifying them that George had hired Roehrig and Glenn Hara (**Hara**) to help George coordinate his various legal matters.[6] George does not deny sending the letter, but maintains that Roehrig was hired only to represent his interests.

As noted above, Roehrig informed Title Guaranty that he represented Jack's Tours, as well as George.

### D. *Roehrig's Interactions with Carol*

Central to the dispute between George and Roehrig is a series of communications between Roehrig and George's ex-wife Carol. Many details and aspects of these communications are disputed by the parties, including whether and to what extent they were impliedly authorized by George, whether they were necessary to the completion of the settlements of 97–402 and 97–471, whether Roehrig kept George reasonably informed about the communications, whether Roehrig explained matters related to the communications to the extent reasonably necessary for George to make informed decisions, whether Roehrig impermissibly disclosed information to Carol related to his representation of

---

5. Roehrig also states that George disclosed to him that George had engaged in "criminal activity" at Jack's Tours and that George was afraid that those activities would be discovered in the litigation with Raymond. However, neither of the September 15, 1997 letters mention the existence of any business-practice-related conditions to Roehrig's representation of George or any representation of Jack's Tours by Roehrig. Roehrig cites George's letter as support for the proposition that his firm's legal representation was made conditional on George clearing future business decisions with Hara because of the lawyers' concerns about George's allegedly unlawful conduct. George denies that he and Roehrig discussed such issues or that there were any preconditions to Roehrig's representation.

6. More specifically, George's letter to counsel stated:

> As my personal and business affairs become more complex, I find that I am dealing with more and more lawyers who represent me personally and/or some of the entities with which I am involved.
>
> I am presently in the process of attempting to evaluate the various legal matters with which I am involved in order to prioritize the efforts and resources to be spent. I am currently consulting with Glenn Hara, Esq., and Stanley Roehrig, Esq. I look to them as general counsel in coordinating my various legal matters.
>
> I am asking that you assist Stan and Glenn should they contact you for information. [ ]

George, whether Roehrig failed to adequately represent George's interests with respect to the issue of Carol's consent to the transfer of Raymond's stock to George, and whether Roehrig at some point began to cooperate with, act in concert with, and/or take directions from Carol to the point that Roehrig's communications and actions were adverse to George. George claims, and Roehrig does not dispute, that at the time Roehrig was representing George there was personal animosity and legal adversity between George and Carol.

Notwithstanding the disputed nature of the facts surrounding the communications between Roehrig and Carol, the opposing arguments regarding their materiality, and the conflicting inferences that arguably may be drawn from the evidence, it is necessary for this court to reference some of the testimonial and documentary evidence presented by the parties in conjunction with the summary judgment motions.[7]

At deposition, Roehrig testified that about two days prior to placing the settlements on the record in 97–402 and 97–471, he called Carol to "check with her if she was okay with what we were planning to put on the record ... because it was going to require her approval as a director." Roehrig further testified that, after explaining the terms of the settlement script to Carol, informing her that the settlement would be placed on the record before the court, and that, as directors of Jack's Tours, she and Troy would have to sign consents for the stock transfer, Carol said that "it sounded okay with her." Apparently, Roehrig made no attempt to confirm Carol's approval in writing prior to placing the settlement on the record. The record does not reflect any communication with Troy regarding his consent. George maintains that the communication with Carol was unnecessary, as discussed further below, because director consent was not required for intra-family transfers of stock in Jack's Tours.

Apparently, after the settlements in 97–402 and 97–471 were placed on the record, Carol changed her mind. Hara drafted a memo to file, dated July 29, 1998, describing a call he received from Carol. The memo stated that Carol had some questions about the script. Hara informed her that the settlements had already been placed on the record. Carol raised concerns about George getting Raymond and Leslie's stock, possible tax consequences to Troy if stock was transferred to him, and Raymond's right of first refusal to purchase the Jack's Tours stock. Carol indicated that she would be signing and mailing the consent.

On or about July 30, 1998, Carol wrote to Roehrig regarding the consent of the directors:

> There is a provision in the settlement that concerns me.
>
> # 1 Transfer of shares of stock in Jack's Tours, Inc. to George. In all fairness to the remaining shareholders, Troy and I are in agreement that the shares of stock in Jack's Tours, Inc. be transferred to Jack's Tours, Inc. or its remaining shareholders as approved by its Board of Directors.
>
> I have confidence that Raymond Miyashiro will not oppose this revision.

On or about August 26, 1998, Carol again wrote to Roehrig:

> I am inquiring about the status of a proposed distribution of the shares of stock in Jack's Tours, Inc. purchased from Ray Miyashiro, et al. for the Board of Directors Approval. Have you come up with a fair distribution of shares for the remaining shareholders for Board consideration?
>
> I am also interested to know how George plans to arrange the $300,000 payment to Raymond.
>
> I would appreciate an updated report on the settlement.

A document that appears to be a September 3, 1998 memo to file by Hara includes: "SHR already talked to Carole [sic] Miyashi-

---

7. It is neither possible nor fruitful for this court to fully catalogue the voluminous affidavit and deposition testimony, documents, and proffered inferences to be drawn from the evidence, that were presented to the Circuit Court in conjunction with the summary judgment motions in this case.

ro re: her most recent letter. She will sit tight." In opposition to summary judgment, George also offered a copy of a document, also dated September 3, 1998, that appears to be a draft of a letter or fax from Roehrig, and states:

Dear Carole [sic]:

In our telephone conversation on September, 1998,[8] we agreed that the time is not yet right to address the issue of the distribution of shares of Jack's Tours among the remaining shareholders. It is my understanding that the $300,000 to be paid in cash will be paid out of George's pocket.

Also, the settlement agreement calls for the provision of services worth $300,000.00 by Jack's to TransHawaiian [sic]. I am told by Don Bowers that Jack's has already started to provide these services.

If you have any other questions please call me.

On or about September 3, 1998, Carol wrote to Roehrig:

It's been a week and I haven't heard anything from you. I would like to request a response to my August 26, 1998 letter to you, a copy of which I am enclosing.

A typed memo from Hara to Roehrig dated September 29, 1998, states:

RE: Raymond's shares of stock

Attached is a letter from Roy Nakamoto that is self-explanatory. You were going to call Carol Miyashiro re: any problems with Don signing the shares as secretary. Please call Carol Miyashiro so we can set [sic] the stock certificates signed and ready

to be endorsed by Castroverde and put into escrow.

On the bottom of the typed message, a handwritten response read in part (the last few words were cut off in the copy submitted to the court):

*Glen:*

Carol says o.k. for *only* this.

Hereafter she has reservations about Don. She will send me a letter w/ details.

SHR

P.S. Make sure we keep our hands on shares. Have Geo [sic] sign note to Escrow agreeing that we hold stock ... [9]

On or about October 6, 1998, Carol again wrote a letter to Roehrig (which was faxed to Roehrig on October 7, 1998): [10]

Dear Mr. Roehrig:

I received a copy of the escrow instructions from your office in yesterday's mail.

Troy and I object to the instructions as shareholder [sic] and directors of the company[.] It is in violation of the consent of Directors as the transfer is in conflict with what we signed "the shares of stock shall be transferred to Jack's Tours, Inc. or its remaining shareholders as approved by its Board of Directors."

I want to make it clear that Troy and I do not approve the escrow instructions as written and reserve all legal rights.

Per your instructions to me, you will be notifying escrow that all stock certificates shall be held with you, in trust, until final settlement is made on the distribution by all parties involved.

---

8. The blank in the date appears to be filled in with a "2."

9. George also submitted to the Circuit Court an unsigned document, typed on RRWH letterhead with a date of October 7, 1998, and bearing what appears to be a handwritten slash across it, that read:

INSTRUCTIONS TO ESCROW
TO WHOM IT MAY CONCERN:

I hereby authorize escrow to turn over any and all stock certificates of Jack's Tours, Inc., to the care of Stanley H. Roehrig, Esq. at the close of escrow.

The document has a blank signature line for JACK'S TOURS, INC. By George Miyashiro Its President. In a declaration, George states that he refused Roehrig's request to sign the document and instead drew a line through it.

10. In deposition, Carol testified that, at about the time of the October 6, 1998 letter (which she refers to by the date of the fax cover), George threatened to discontinue his financial support for Troy in order to induce Carol and Troy to consent to the stock transfer to George. Carol also described George's threats as occurring at or about the time that the Title Guaranty escrow closed.

In our conversation of this afternoon, I believe the amount compensated by the company has been misrepresented. Total consideration is $750,000, not $600,000, as mentioned $300,000 cash to be paid personally by George, $300,000 in services from Jack's Tours plus a waiver of accounts receivable of $150,000 due and owing to the company for services previously rendered.

Therefore, of Ray's 28% share George will receive 11.2% for his $300,000 cash payment, and 16.8% of Jack's Tours services divided by three, 5.6% each. The fair distribution is as follows:

| | |
|---|---|
| George (11.2% + 5.6%) | 16.8% |
| Troy | 5.6% |
| Jeff | 5.6% |
| | 28.0% |

Carol's October 6, 1998 letter apparently referred to a consent of director's form prepared by RRWH, upon which Carol apparently added a handwritten "amendment," which was initialed by Carol and Troy.[11] The purported amendment, dated July 31, 1998, states that the shares of Jack's Tours stock would be transferred to "Jack's Tours or its remaining shareholders as approved by its Board of Directors," rather than to George.

On the day after receiving Carol's letter, Roehrig sent the "supplemental escrow instruction" to Title Guaranty, directing delivery of the shares of Jack's Tours stock to Roehrig purportedly per the authorization of "his client," Jack's Tours.

After the October 18, 1998 closing of escrow, on November 4, 1998, Carol again wrote to Roehrig:

Re: Distribution of Shares of Stock in Jack's Tours, Inc. Purchased from Ray Miyashiro

In reviewing our phone conversation yesterday, I felt that your options mentioned were unfair and lacking in good faith.

As directors of the company, Troy and I believe that my proposal in my letter to you dated October 6, 1998 is fair for all concern [sic] and stands.

## E. Further Events Following the Close of the Title Guaranty Escrow

On October 20, 1998, Donald Bowers of Jack's Tours sent a fax to Roehrig stating, "George asked me when will he get his Stock. Do I need to have Doug Ing let the PUC know of the transfer to George or has this been done? ?" In a declaration submitted in opposition to summary judgment, George attested that, "[f]rom October 20, 1998, through [and] into the first part of 1999, I tried time and time again to get Stan Roehrig to give me my share certificates and at all times he refused to do so." Roehrig does not deny this.

On January 4, 1999, Roehrig resigned as George's attorney and continued to hold custody of the stock certificates. On March 9, 1999, George filed a motion in the Circuit Court to enforce the July 24, 1998 settlement agreement in 97–402 and 97–471.[12] On March 31, 1999, the Circuit Court held a hearing on the motion and, after hearing from all parties, ordered that Roehrig turn over possession of the stock certificates to George.

On April 5, 1999, Carol, Jeff, Troy, and Jack's Tours filed a complaint against George and Don Bowers, in Civil No. 99–151 in the Circuit Court (**99–151**), for fraud, embezzlement, and injunctive relief. The complaint prayed for, *inter alia,* an order requiring George to deliver the subject Jack's Tours stock certificates to Carol.[13] After various motions and hearings, on May 19, 1999, the Circuit Court entered a preliminary injunction in 99–151 ordering George to deposit the

---

11. There is conflicting evidence regarding whether George signed the consent form before or after the edits and whether the changes to the consent form effectively modified stock distribution under the settlement. George denies agreeing to any modification of the settlement terms, specifically the term by which he received Ray and Leslie's stock in Jack's Tours.

12. The Honorable Riki May Amano presided.

13. The complaint averred, *inter alia,* that Carol had become president of Jack's Tours in January of 1999.

stock certificates with the Circuit Court pending the resolution of the lawsuit.[14]

Effective August 15, 2002, George entered into a settlement agreement with the other parties in 99–151 that resulted in George selling or otherwise relinquishing all of his interest in Jack's Tours, including the disputed stock certificates, in exchange for consideration that included certain payments to George and dismissal with prejudice of all claims against George.

### F. *The Relevant Proceedings Below*

#### 1. George's claims against the defendants

On July 19, 2004, George filed a complaint against Roehrig, RRWH, Hara, Carol, Jeff, Title Guaranty, and Doe Defendants. On August 4, 2004, George filed a first amended complaint (**Complaint**). The Complaint included claims for: (1) legal malpractice; (2) breach of fiduciary duty; (3) negligent misrepresentation; (4) constructive fraud; (5) conspiracy to defraud; (6) breach of contract; and (7) a second breach of contract claim. Counts 1–4 and 6 were directed against RRWH, Roehrig and Hara. The conspiracy claim in count 5 was directed against RRWH, Roehrig, Hara, Carol and Jeff. Count 7 set forth a breach of contract claim against Title Guaranty.

All claims against Carol and Jeff were dismissed by notice on October 20, 2004. All claims against RRWH and Hara were dismissed with prejudice by stipulation and order on September 1, 2005. After these dismissals, the remaining claims were counts 1 through 6 against Roehrig and count 7 against Title Guaranty.

#### 2. The *pro hac vice* motions

On September 16, 2004, George filed a motion to allow Eugene J. Albertini, Esq. (**Albertini**) to appear as *pro hac vice* counsel.

The motion was heard on October 11, 2004 by the Honorable Ronald Ibarra. Judge Ibarra denied the *pro hac vice* motion without prejudice. Subsequently, on December 8, 2004, Judge Ibarra disqualified himself from this case.[15]

On November 22, 2004, George filed a second motion for appointment of Albertini as *pro hac vice* counsel. George's motion was heard by the Honorable George M. Masuoka on April 6, 2005. After hearing that the parties reached an agreement concerning admission of Albertini *pro hac vice*, subject to certain limitations, Judge Masuoka agreed to grant limited *pro hac vice* status to Albertini. Albertini's limited status did not permit him to take part in courtroom proceedings or address the court, but did allow him to take depositions, engage in mediation or settlement discussions, and be present in court with George's lead counsel David Gierlach (**Gierlach**). At the April 6, 2005 hearing, it was clearly stipulated, twice stated on the record by Roehrig's counsel, that the issue of Albertini's participation in the trial was reserved. The Circuit Court adopted the parties' stipulation, subject to Albertini's continued good conduct. The September 1, 2005 written order granting in part and denying in part George's motion to allow Albertini to appear as *pro hac vice* counsel, however, did not mention the reservation of the issue of Albertini's participation at trial.

On August 28, 2006, George filed a third motion asking the Circuit Court to expand Albertini's limited *pro hac vice* status to "full status." On September 19, 2006, the motion was argued before Judge Masuoka. Judge Masuoka orally denied the motion to alter Albertini's limited *pro hac vice* status. Judge Masuoka explained his reasoning:

Now, this Court, as both of you well know, was not going to permit Mr. Albertini pro hac vice status. This Court is of the

---

**14.** The Honorable Greg K. Nakamura presided.

**15.** Hara, now a Circuit Court judge, disqualified himself from hearing this case on July 22, 2004. The Honorable Greg K. Nakamura disqualified himself on July 27, 2004. The Honorable Judges Terence T. Yoshioka, Ben H. Gaddis and Barbara T. Takase disqualified themselves on December 7, 2004. On December 10, 2004, the Honorable

Matthew S.K. Pyun, Jr., formerly the attorney for Raymond and Trans Hawaiian, disqualified himself. On December 14, 2004, the Honorable George M. Masuoka of the Circuit Court of the Fifth Circuit was assigned to preside temporarily in the Circuit Court of the Third Circuit for this case.

belief that it's discretionary with the court. It's not the rule doesn't make sense. [sic]

It would be you pay the fees and you can do a case. Never mind how many, as long as you're coming in here only in a civil case. You find somebody to work with.

The Court has discretion. And the Court, to a certain extent, agreed with Judge Ibara [sic] in the first instance. And this Court also cautioned you, Mr. Gierlach, that in the event that Mr. Albertini didn't meet the Court's professional standards, this Court would revoke pro hac vice and you would have to continue with the case.

Likewise, this Court also said that the Court always considers local counsel as lead counsel. But because of the agreement between yourself, Mr. Gierlach, and the opposing counsel saying you would agree to permit him to participate in the preparation of the case but not make any presentation to the Court, this Court, notwithstanding its better judgment, permitted him to come in pro hac vice on a limited basis.

This Court cannot see changing that. If this Court were to change, it would go back to its original intention and say, "No, Mr. Gierlach, you originally took the case. You do the case."

If you were too busy, et cetera, you should not [have taken the case] because you had the case once [before]. So you had an idea of what it was, that it was dismissed without prejudice and it was filed again.

So you knew to a certain extent what the case was about because the rules require you to do an investigation prior to filing any complaint on behalf of any client.

So under the circumstances, since this Court has already permitted Mr. Albertini on a limited basis to appear as pro hac vice and this was on the agreement of the other counsel, the Court is not going to revoke that order. But nor is it going to permit any expanded participation by Mr. Albertini.

On October 5, 2006, George petitioned the Hawai'i Supreme Court for a writ of mandamus seeking to compel the Circuit Court to grant Albertini full *pro hac vice* status. As discussed further below, on November 1, 2006, the petition for a writ of mandamus was denied. George then petitioned the United States Supreme Court for a writ of certiorari. That petition was rejected. *See Miyashiro v. Masuoka*, 549 U.S. 1339, 127 S.Ct. 2035, 167 L.Ed.2d 764 (2007).

### 3. The subject summary judgment motions

Title Guaranty filed a motion for summary judgment on February 8, 2006. The motion was granted on July 3, 2006. An order granting Title Guaranty's motion for a Hawai'i Rules of Civil Procedure (**HRCP**) Rule 54(b) judgment apparently was entered on October 11, 2006 and a notice of appeal was filed. That appeal was dismissed based on jurisdictional defects (judgment was not properly entered).

On September 11, 2006, Roehrig filed four motions for summary judgment and a master statement of facts in support. Roehrig's motions for summary judgment dealt with four "central aspects" of the case. Roehrig's motions included:

(1) a motion for summary judgment on George's (allegedly) admitted embezzlement and breach of fiduciary duty;

(2) a motion for summary judgment on conspiracy claims;

(3) a motion for summary judgment on Bylaws; and

(4) a motion for summary judgment on the Hawai'i Rules of Professional Conduct (**HRPC**).

The substance of these motions will be addressed below in conjunction with this court's review of the Circuit Court orders granting them.

After arguments were presented at an October 16, 2006 hearing, all four motions were granted orally at a December 21, 2006 hearing and by written orders entered on December 28, 2006. On December 28, 2006, the Circuit Court entered a Final Judgment in favor of Roehrig and against George on all claims alleged in the Complaint. An Amend-

ed Final Judgment was entered on January 11, 2007, also entering judgment in favor of Title Guaranty and against George. The Circuit Court filed a Second Amended Final Judgment on April 24, 2007, which included an attorneys' fees award in favor of RRWH, Roehrig and Hara, and against George, in the amount of $616,060.21.[16] George timely filed a notice of appeal.

## II.  POINTS OF ERROR

On appeal, George raises the following points of error:

(1) The Circuit Court abused its discretion in denying "full" *pro hac vice* status to Albertini;

(2) The Circuit Court erred in granting summary judgment in favor of Title Guaranty;

(3) The Circuit Court erred in granting summary judgment in favor of Roehrig on Roehrig's motion regarding violations of the Hawai'i Rules of Professional Conduct;

(4) The Circuit Court erred in granting summary judgment in favor of Roehrig on the issues related to Jack's Tours' bylaws;

(5) The Circuit Court erred in granting summary judgment in favor of Roehrig on George's conspiracy claims;

(6) The Circuit Court erred in granting summary judgment in favor of Roehrig on the issue of George's allegedly admitted embezzlement and breach of fiduciary duty to Jack's Tours;  and

(7) The Circuit Court erred in ordering George to pay attorneys' fees and costs to Roehrig.

## III.  STANDARDS OF REVIEW

Rule 1.9 of the Rules of the Supreme Court of the State of Hawai'i (**RSCSH**) states:

Any attorney actively licensed to practice law by the highest court of a state or territory of the United States or the District of Columbia who is not a resident of Hawai'i may be permitted to associate him-

self or herself with a member or members of the Hawai'i bar in the presentation of a specific case at the discretion of the presiding judge or judges.

■  This court thus reviews the denial or limitation of *pro hac vice* status for an abuse of discretion.  An abuse of discretion occurs if the trial court has "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 114, 839 P.2d 10, 26 (1992).

On appeal, the grant or denial of summary judgment is reviewed *de novo*.  *See State ex rel. Anzai v. City and County of Honolulu*, 99 Hawai'i 508, 514, 57 P.3d 433, 439 (2002); *Bitney v. Honolulu Police Dep't*, 96 Hawai'i 243, 250, 30 P.3d 257, 264 (2001).

The Hawai'i Supreme Court has articulated that:

[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.  The evidence must be viewed in the light most favorable to the non-moving party.  In other words, we must view all of the evidence and inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Kahale v. City and County of Honolulu*, 104 Hawai'i 341, 344, 90 P.3d 233, 236 (2004) (citation omitted).

The evidentiary standard required of a moving party in meeting its burden on a summary judgment motion depends on whether the moving party will have the burden of proof on the issue at trial.  Where the moving party is the defendant, who does not

---

**16.**  We note that the September 1, 2005 Stipulation for Partial Dismissal With Prejudice, which dismissed the claims against Hara and RRWH, specifically stated that each party was to bear his or its own attorney's fees and costs.

bear the ultimate burden of proof at trial, summary judgment is proper when the non-moving party-plaintiff—

> fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of [his or] her case with respect to which [he or] she has the burden of proof.

*Exotics Hawai'i–Kona, Inc. v. E.I. Du Pont de Nemours & Co.,* 116 Hawai'i 277, 302, 172 P.3d 1021, 1046 (2007) (citations, internal quotation marks, brackets, and ellipses omitted).

■ "The trial court's grant or denial of attorney's fees and costs is reviewed under the abuse of discretion standard." *Sierra Club v. Dep't of Transp. of the State of Hawai'i,* 120 Hawai'i 181, 197, 202 P.3d 1226, 1242 (2009) (citations and brackets omitted).

## IV. DISCUSSION

### A. Albertini's Pro Hac Vice Status

George argues that the Circuit Court abused its discretion when it arbitrarily denied Albertini "full" *pro hac vice* status on September 19, 2006.[17] George argues that Albertini should have been granted full *pro hac vice* status because Albertini: (1) is a California attorney in good standing; (2) is George's attorney of choice; (3) had already been granted partial *pro hac vice* status by the Circuit Court; and (4) was already intimately familiar with George's case.

George does not, however, explain what exactly he means by "full" *pro hac vice* counsel status. In his opening brief, George states, "Gierlach did not have the time or inclination to be primary counsel in this case." In his August 28, 2006 renewed motion to the Circuit Court, George argued that he has a constitutional right to "counsel of choice" with "full standing." Apparently, George contends that it was an abuse of the Circuit Court's discretion not to grant Albertini the same rights, privileges, and responsibilities of a Hawai'i-licensed attorney, for the purposes of his representation of George in this case. We disagree.

In Hawai'i, *pro hac vice* status is governed by RSCSH Rule 1.9 (emphasis added):

> Any attorney actively licensed to practice law by the highest court of a state or territory of the United States or the District of Columbia who is not a resident of Hawai'i **may be permitted** to associate himself or herself with a member or members of the Hawai'i bar in the presentation of a specific case at the discretion of the presiding judge or judges.

Rule 1.9 includes no mandate for unlimited admission to practice *pro hac vice* before Hawai'i courts. Instead, Rule 1.9 provides a presiding judge with the *discretion* to allow an out-of-state licensed attorney to *associate himself or herself* with a Hawai'i-licensed attorney in a particular case. Rule 1.9 permits *pro hac vice* counsel to practice *only* in association with a Hawai'i-licensed attorney. Hawai'i courts commonly allow *pro hac vice* admission subject to continuing conditions, such as requiring the Hawai'i—licensed attorney to serve as lead counsel and to meaningfully participate in the case, and specifying that all service be made on the Hawai'i-licensed attorney, rather than requiring opposing parties to send court filings and discovery papers to the mainland counsel. *See, e.g., Bank of Hawaii v. Kunimoto,* 91 Hawai'i

---

**17.** In his points of error, George references all three *pro hac vice* orders, but he only presents argument related to the Circuit Court's ruling on George's August 28, 2006 renewed motion to allow Albertini to appear as counsel *pro hac vice* with full status. Points not argued may be deemed waived. Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 28(b)(7). Moreover, in light of George's stipulation to the limitations set forth in the Circuit Court's September 1, 2005 order granting in part and denying in part George's second motion to allow Albertini to appear as counsel *pro hac vice,* any objection to the Circuit Court's first two rulings on Albertini's *pro hac vice* status was either mooted or waived.

372, 376, 394, 984 P.2d 1198, 1202, 1220 (1999) (circuit court granted *pro hac vice* application on the conditions that: (1) there shall be meaningful participation by local counsel; (2) service shall be on local counsel; and (3) local counsel shall at all times remain lead counsel; supreme court affirmed further conditions upon any future request for *pro hac vice* admission).

Before further examining George's argument that the Circuit Court abused its discretion in retaining the agreed-upon limitations on Albertini's *pro hac vice* admission, we consider the Hawaiʻi Supreme Court's review of this very issue. In its order denying George's petition for a writ of mandamus, the supreme court ruled that Judge Masuoka did not commit a "flagrant and manifest abuse of discretion." The supreme court concluded:

[I]t appears that there is no federal or state constitutional right to *pro hac vice* appearance of counsel before any Hawaiʻi state court. *See Bank of Hawaii v. Kunimoto,* 91 Hawaiʻi 372, 388, 984 P.2d 1198, 1214 (1999). Granting Eugene Albertini full *pro hac vice* status in Civil No. 04–1–0211 was within the discretion of the circuit judge, *see* RSCSH 1.9, and the refusal to do so for the reasons for which *pro hac vice* appearance was initially denied was not a flagrant and manifest abuse of discretion.

Neither party addresses the distinction between the flagrant-and-manifest-abuse-of-discretion standard applied by the supreme court on a petition for writ of mandamus and the abuse-of-discretion standard applied on direct appeal, or whether principles of *stare decisis* or collateral estoppel dictate our conclusion. In any case, we find the supreme court's reasoning to be compelling and applicable to George's contention that the Circuit Court abused its discretion. In light of the facts and circumstances of this case, particularly George's prior agreement to the limited representation and the concerns articulated in the first instance by Judge Ibarra and reiterated by Judge Masuoka at the September

ber 28, 2006 hearing, we conclude that the Circuit Court did not abuse its discretion in denying Albertini full *pro hac vice* counsel status.[18]

### B. *Summary Judgment in Favor of Title Guaranty*

The Complaint sets forth a single breach-of-contract claim against Title Guaranty. In addition to incorporating by reference the factual allegations of the Complaint, Count VII states:

Defendant Title Guaranty Co. entered into a contract with Plaintiff in which Defendant Title Guaranty agreed to act only consistent with instructions given by Plaintiff. Title Guaranty breached its contractual obligations owed to Plaintiff and as a direct and proximate result, Plaintiff has sustained substantial pecuniary damages in an amount to be proved at trial.

■ George argues that the Circuit Court erred when it entered summary judgment in favor of Title Guaranty and against George because there were genuine issues of material fact in dispute. George argues, in part, that there is "no doubt" that Title Guaranty breached its duty to George, as a party to the escrow, when Title Guaranty delivered the Jack's Tours stock certificates to Roehrig as directed in Roehrig's October 7, 1998 "supplemental escrow instruction." However, before we consider the issue of Roehrig's supplemental escrow instruction, we must more specifically identify Title Guaranty's contractual duty to George.

It is undisputed that the subject contract is embodied in the escrow instructions prepared and signed by the parties to the 97–402 and 97–471 settlements, as set forth in Section I.B. above, and the additional terms set forth in the Tentative Buyer's Statement, which was also signed by George. The parties' escrow instructions (at ¶ 7) create a duty for Title Guaranty to deliver the stock certificates to George, but do not specify an address for delivery. The Tentative Buyer's Statement identifies George's address as be-

---

**18.** Nor would it be an abuse of discretion for the Circuit Court to consider a more limited request to allow Albertini to participate as associated *pro*

*hac vice* counsel in the trial proceedings upon the remand of this case.

7

ing in care of Roehrig. George does not deny that he received and executed the Tentative Buyer's Statement. The uncontroverted evidence is that the *only* address for George ever provided to Title Guaranty was in care of Roehrig. George has failed to make a showing sufficient to establish the existence of an element essential to his case, *i.e.*, that Title Guaranty had a contractual duty to deliver the stock certificates to him other than in care of Roehrig. *See, e.g., Exotics Hawai'i*, 116 Hawai'i at 301–02, 172 P.3d at 1046 (describing the burden of the nonmoving plaintiff on a summary judgment motion). Simply put, George has failed to bring forward evidence that Title Guaranty breached its duty under the terms of the escrow agreement.

■ As stated by the supreme court in *Exotics Hawai'i*, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* Here, George's complete failure of proof concerning an essential element of his breach-of-contract claim renders immaterial the disputed facts regarding Roehrig's allegedly unauthorized supplemental escrow instruction and whether Title Guaranty accepted Roehrig's supplemental instruction.[19]

For these reasons, we conclude that the Circuit Court did not err when it entered summary judgment in favor of Title Guaranty and against George.

C. *Roehrig's Motion for Summary Judgment on the Hawai'i Rules of Professional Conduct*

As reported above, the Complaint includes six causes of action in which George seeks relief from Roehrig. Roehrig's summary judgment motion on the HRPC did not seek summary judgment by reference to any particular cause of action. Instead, in this motion, Roehrig primarily argued:

In order to achieve George's objective of Raymond's trust surrendering its shares of stock in Jack's Tours, Inc., it was necessary for George to obtain Carol's consent to the share transfer. As George's attorney, Roehrig had to communicate with Carol in order to obtain her consent to the transfer of Raymond's trust's shares. Accordingly, under the HRPC, Roehrig's communication with Carol was impliedly authorized by George in order for Roehrig to carry out his representation of George and settle the *Castroverde* lawsuit.

This part of Roehrig's argument is made in connection with HRPC Rule 1.6(a), which provides:

A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraphs (b) and (c).

■ Roehrig contends that all of his communications with Carol were "impliedly authorized" under HRPC Rule 1.6(a) because he needed to obtain Carol's consent in order to achieve George's objective of the Raymond Trust surrendering its shares of stock, and to settle the lawsuits with Raymond. First, there is a genuine issue of material fact regarding whether George's objective was for George to gain control of Jack's Tours in conjunction with the settlement of the lawsuits, or simply to divest Raymond of any continuing interest in Jack's Tours in conjunction with the settlement of the claims that George engaged in wrongdoing. Second, as detailed in Section I.D. above, Roehrig's communications with Carol went beyond seeking her consent to the stock transfer set forth in the 97–402 and 97–471 settlement agreements. Certainly no later than July 29 or 30, 1998, when Carol expressly and repeatedly informed Roehrig and Hara that she would not consent to the transfer of the

---

19. George's failure of proof concerning his contract claim also renders immaterial, with respect to George's claim against Title Guaranty, the issue of whether the stock transfer restrictions contained in the Bylaws and/or Articles of Incorporation of Jack's Tours prevented the transfer of shares from Raymond to George absent the consent of the directors of Jack's Tours. Therefore, we need not address this issue in the context of the summary judgment entered in favor of Title Guaranty. The Bylaws issue was also the subject of one of Roehrig's summary judgment motions and, therefore, is addressed in that context in Section IV.D. below.

shares of stock in Jack's Tours on the terms that George had understood and agreed to—*i.e.*, Raymond's stock would be transferred to George—a genuine issue of material fact exists as to whether Roehrig's communications were impliedly authorized.

In the face of a potentially game-changing development in an attorney's representation of a client, such as Carol's change-of-mind as to her consent, the "implied authorization" provision in HRPC Rule 1.6(a) must be analyzed in conjunction with other relevant provisions of the HRPC and the attorney's substantive legal duties. In this case, for example, HRPC Rule 1.6(a) should be considered in light of HRPC Rule 1.4, which provides:

**Rule 1.4. Communication.**

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.....

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

In other words, even when a disclosure of information may be impliedly authorized in the first instance, that authorization may be subject to limitations, and may give way to other duties, such as the duty to keep the client reasonably informed, reasonably advised, and in the decision-making role, including with respect to the means by which objectives are pursued. *See also* HRPC Rule 1.2(a) ("A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to [certain limitations], and shall consult with the client as to the means by which the objectives are to be pursued.") In this case, there is evidence in the record that Roehrig's communications revealed not only the fact of and terms of the proposed settlements in advance of Carol's initial consent. After Carol took a position that was adverse to George, Roehrig further informed Carol of information related to Roehrig's representation of George such as the source of funds, the proposed escrow instructions, and strategic information and/or advice as to the

advisability of seeking to amend the settlements that were put on the record in 97–402 and 97–471 versus closing the transaction with Raymond and then working out a different distribution of the shares of stock. There exists a genuine issue of material fact as to whether Roehrig's communications with Carol were impliedly authorized pursuant to HRPC Rule 1.6(a).[20]

In his summary judgment motion on the HRPC, Roehrig further argued that neither of the two March 1999 affidavits that he filed in 97–402, in support of his motion for leave to deposit stock certificates with the Circuit Court, violated HRPC Rule 1.6. Roehrig's motion to deposit the stock followed George's motion to enforce the settlement agreement, which sought an order that the stock be turned over to George. In these affidavits, Roehrig disclosed the details of his purported separate agreements with George and Carol—*i.e.*, that Roehrig would act as a stakeholder for the Jack's Tours stock certificates—including the substance of his alleged conversations with George. Roehrig claimed, *inter alia*, that his first affidavit (dated March 19, 1999) did not disclose any privileged attorney-client communications, and that his second affidavit (dated March 30, 1999) followed an affidavit executed by George, which purportedly disclosed some of their attorney-client communications, thereby waiving George's privilege in advance of Roehrig's second affidavit.

In opposition to the motion for summary judgment, George argued that Roehrig's affidavits in support of his March 1999 request to deposit the stock certificates with the Circuit Court were simply the final act in what George alleges was a breach of Roehrig's common law duties to George including, *inter alia*, that Roehrig breached his duty of loyalty to his client and that Roehrig's representation of George fell below the reasonable standard of care, skill, and diligence which must be exercised by an attorney. We agree that Roehrig's affidavits were the last manifestation of Roehrig's refusal to turn the stock certificates over to George. Thus,

---

**20.** Accordingly, at this point, we need not delve into George's argument that the communications

with Carol were unnecessary because her consent was unnecessary.

Roehrig's statements were potentially relevant to breaches other than the alleged breaches of confidentiality. We also agree, however, with the Circuit Court's analysis that statements made by Roehrig in his March 30, 1999 affidavit in response to George's March 27, 1999 affidavit were not in violation of George's attorney-client privilege or HRPC Rule 1.6(a) because George waived his privilege in furtherance of his attempt to gain possession of the stock certificates from Roehrig. Thus, Roehrig's affidavit disclosures were not in violation of the HRPC confidentiality duty. *See* HRPC Rule 1.6(c)(3).

■ Additionally, Roehrig claimed that his testimony during a preliminary injunction hearing in 99–151 did not violate HRPC Rule 1.6(a) because Judge Nakamura ruled in that case that George had waived his privilege, and Judge Nakamura ordered Roehrig to testify. On this point, we agree that summary judgment was properly granted in part. HRPC Rule 1.6(c)(6) provides that:

> A lawyer may reveal information relating to representation of a client to the extent the lawyer reasonably believes necessary:
>
> . . .
>
> (6) to comply with other law or court order.

Thus, Roehrig's hearing testimony pursuant to the order of Judge Nakamura was within the exception set forth in HRPC Rule 1.6(c)(6).[21]

Finally, we conclude that many of the allegations set forth in the Complaint, if proven at trial, could be construed as actions in violation of the HRPC. As detailed in the report from George's expert, Professor Randall Roth, and as set forth in letters dated August 16 and September 25, 2006, there was evidence in the record that, *inter alia:* (1) there was personal animosity and legal adversity between George and Carol, including open legal questions about claims Carol was making to George's property, including stock in Jack's Tours; (2) Roehrig divulged confidential information to Carol without George's consent, and arguably provided legal advice to Carol that adversely affected George; (3) Roehrig refused to deliver the stock certificates to George, notwithstanding George's repeated demands, even writing a memo to Hara stating, "make sure we keep our hands on shares;" (4) Roehrig caused George and Carol to believe that George could not vote the Jack's Tours shares, if Roehrig held them; (5) prior to and after Roehrig's withdrawal from representation of George, he continued to communicate with Carol, without George's consent, and sometimes without George's knowledge. Professor Roth opined that Roehrig violated Rules 1.1, 1.2, 1.3, 1.4, possibly 1.6, 1.7, probably 1.8, 1.9, possibly 1.10, 1.13, 1.15(f)(4),

---

21. As there has been substantial argument presented to the Circuit Court and on appeal regarding the effect of Judge Nakamura's rulings in 99–151, we want to be clear that this conclusion is based on the fact that Judge Nakamura's order that Roehrig testify excused Roehrig from his obligation to maintain the confidentiality of George's representation-related information at the hearing before Judge Nakamura. This conclusion is not based on collateral estoppel or any other preclusive doctrine. The supreme court has held:

> In order to establish a claim of collateral estoppel, the party asserting the claim has the burden of establishing that: (1) The issue decided in the prior adjudication is identical to the one presented in the action in question; (2) **there is a final judgment on the merits;** (3) the issue decided in the prior adjudication was essential to the final judgment; and (4) the party against whom collateral estoppel is as-

serted was a party or in privity with a party to the prior adjudication.

*Lingle v. Haw. Gov't Employees Ass'n,* 107 Hawai'i 178, 186, 111 P.3d 587, 595 (2005) (emphasis added, citations and brackets omitted, format altered).

As 99–151 was dismissed with prejudice after settlement, and there was no final judgment on the merits, Judge Nakamura's rulings have no collateral estoppel effect. *See also McLellan v. Atchison Ins. Agency, Inc.,* 81 Hawai'i 62, 69, 912 P.2d 559, 566 (App.1996) (collateral estoppel did not apply to preclude the present action because the prior case was dismissed based on a stipulated settlement and the issues in question were not actually litigated and decided); *cf. In re Dowsett Trust,* 7 Haw.App. 640, 645, 791 P.2d 398, 402–03 (1990) (stipulation of dismissal with prejudice constitutes a final judgment on the merits for the purpose of *res judicata* though not for the purpose of collateral estoppel; all elements of *res judicata* must be satisfied for doctrine to apply).

possibly 1.16, 2.2, possibly 3.3, 4.1, 4.3, and 8.4 of the HRPC.

Under HRPC Rule 1.7(b), for example:

A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

The comments section of Rule 1.7 recommend that "[i]f such a conflict arises after representation has been undertaken, the lawyer should withdraw from the representation." There is a genuine issue of material fact regarding whether Roehrig's representation of George was materially limited by the responsibility he undertook to Carol and/or Jack's Tours, when he purportedly became a stakeholder or trustee for the stock certificates.

In a declaration, George attested that he learned that Roehrig and Carol were having ongoing communications for the first time at an October 6, 1998 meeting with Roehrig. George further states that "[a]t no time did Roehrig ever receive any waiver of conflict of interest from me to talk to a clear adversary and I did not approve at anytime of Roehrig's actions."

Finally, we recognize that violation of the HRPC does not, *per se,* equate liability in tort or contract. *See, e.g.,* HRPC, Scope, ¶ 6 ("Violation of a rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached."). However, as the supreme court noted in *Delmonte v. State Farm Fire & Cas. Co.,* 90 Hawai'i 39, 54 n. 12, 975 P.2d 1159, 1174 n. 12 (1999) (citations and internal quotation marks omitted):

[T]he requirements of the HRPC are at least relevant to a determination of the duty owed by an attorney to his or her client. Given the potential consequences of their violation and the fundamental nature of their purpose, it would not be logical or reasonable to say that the Bar Rules, in general, do not play a role in shaping the care and skill ordinarily exercised by attorneys practicing law.

There are genuine issues of material fact concerning whether Roehrig's communications with Carol constituted legal advice— *e.g.,* whether Carol should have sought changes to the 97–402 and 97–471 settlements and whether Carol should "sit tight" until after the escrow closed—therefore an adverse representation. Roehrig also held himself out as attorney for Jack's Tours, which arguably required disclosures to George regarding the implications of common representation, consultation and consent. *See* HRPC Rule 1.7(b)(2).

Accordingly, we conclude that summary judgment on the HRPC was properly granted in part only with respect to the allegations involving Roehrig's March 1999 affidavits and April 1999 hearing testimony. In all other respects, there are genuine issues of material fact and the Circuit Court erred in granting Roehrig's motion for summary judgment on the HRPC.

### D. *Roehrig's Motion for Summary Judgment on the Bylaws*

Roehrig's motion for summary judgment on the Bylaws, like his motion for summary judgment on the HRPC, did not seek summary judgment by reference to any particular cause of action. Instead, in this motion, Roehrig argued that: (1) all of George's claims against Roehrig are based on the premise that George would have been the majority shareholder in Jack's Tours, but for Roehrig's breaches of his duties to George; (2) *the Bylaws of Jack's Tours required its directors' consent to any transfer of Raymond's shares;* (3) two of the directors, Carol and Troy, consented only to the transfer of Raymond's shares to Jack's Tours or its remaining shareholders as approved by its board of directors; and (4) therefore, George was never legally entitled to receive all of Raymond's shares and, accordingly, suffered

no damages as a result of Roehrig's breach, if any.

In opposition to this summary judgment motion, George argued Roehrig "did not do his homework" regarding the Bylaws and that his interpretation of the Bylaws, and his representation of George in conjunction therewith, fell below the standard of diligence and care that Roehrig owed to his client. The critical section of the Jack's Tours Bylaws, Section 5.05(a),[22] provides in relevant part:

> SECTION 5.05 RESTRICTIONS ON TRANSFERS. (a) The shares of stock of this corporation shall not be transferable or assignable or be the subject of sale until first offered in writing to the Board of Directors of the corporation for purchase at the book value as of date of offer. In determining the book value, the value of good will or firm name shall be included only to the extent as carried in the books of the corporation. The Board of Directors shall determine whether to purchase it in the corporate name thirty (30) days after date of offer. If said offer is refused by the Board of Directors, then the said shares of stock shall be offered by the Board of Directors upon such terms as the Board of Directors may determine to a person or persons they may select, which offer shall be open for sixty (60) days from the date of refusal by the Board of Directors. If there be no acceptance by the offeree or offerees within the said sixty (60) day period, then the said shares of stock may be transferred, assigned or sold by the shareholder for a period of sixty (60) days thereafter. If the said shares are not transferred, assigned or sold within the last sixty (60) day period, then the said shares must again be offered to the Board of Directors and the procedure set forth herein be repeated before the said shares may be transferred, assigned, or sold. Notwithstanding the provisions of this Section, the Shareholders may transfer and assign their interests in any of the Shares to themselves and their spouses, descendants, or trusts for the benefit of such persons (Family Assignees) without making the offers to sell the Shares provided in this Agreement. If the Shares are so transferred, the shares shall remain subject to all the terms and provisions of this Agreement.

The crux of George's argument in response to the summary judgment motion was that "George was represented by Roehrig, who had a responsibility to make certain that he understood all the requirements necessary in order to have Raymond and Leslie Miyashiro's shares transferred to George. That included reading the By-laws...." George further argued that consent of the Jack's Tours directors was not required for intra-family transfers, and that Roehrig's assumption of a position to the contrary was adverse to his client and fell below the standard of care Roehrig owed to George.

█ We need not reach the issue of George's interpretation of the Bylaws. This was Roehrig's motion for summary judgment. The motion hinged on Roehrig's argument that, as a matter of law, *the Bylaws of Jack's Tours required its directors' consent to any transfer of Raymond's shares.* Nowhere in Section 5.05(a) is there any statement whatsoever that directors' consent is required for a transfer of shares of stock. Instead, Section 5.05(a) of the Jack's Tours Bylaws sets forth a specific *procedure* whereby stock in Jack's Tours may be transferred, assigned or sold. This procedure can be summarized as follows:

*Step 1:* The stock must be offered to the board of directors for purchase at book value in the corporate name. The board has thirty days to buy the stock.

*Step 2:* If the board does not buy the stock, the board shall offer the stock to a person or persons they may select. That offer stays open for sixty days.

*Step 3:* If there is no acceptance of the board's offer, the shareholder then may

---

**22.** While other parts of the Bylaws are arguably relevant to George's claims that Roehrig's representation of George in conjunction with the structure and implementation of the settlement of 97–402 and 97–471, and the events thereafter, fell below the reasonable standard of care, skill, and diligence which must be exercised by an attorney, in light of our ruling regarding Section 5.05(a) and the scope of our review, we need not consider them.

transfer, assign or sell the stock. The shareholder has sixty days to complete this transaction.

*Step 4:* If the shareholder transaction is not completed within sixty days, the shares must again be offered to the board of directors and steps 1, 2, and 3 are repeated.

Bylaws Section 5.05(a) requires that these steps be followed. Under Section 5.05(a), the directors of Jack's Tours had no right to simply approve, reject, or modify the terms of Raymond's transfer of stock to George.[23] Accordingly, we reject Roehrig's argument that, as a matter of law, the Bylaws required directors' consent to the transfer of Raymond's shares to George. We conclude that the Circuit Court erred in granting Roehrig's motion for summary judgment on the Bylaws.

### E. *Roehrig's Motion for Summary Judgment on George's Conspiracy Claims*

In count 5 of the Complaint, George alleges that Roehrig, Carol and Jeff participated in a conspiracy to defraud George. In addition to incorporating by reference his other factual allegations, the conspiracy to defraud cause of action alleges:

a. The Defendants were each communicating with one and another, from in or about **June 1998** through **April 1999** and did so, all with a view to devising a plan, whereby Carol, Jeff and Troy would ultimately receive a controlling interest of the outstanding shares in JACKS TOURS;

b. All parties to the conspiracy concealed their specific intent to devise a plan whereby George would be divested of not only his 28% but also the 28% of JACKS TOURS shares which George was buying from Raymond and Leslie;

c. The nature of the action of the Defendants to this cause of action constitutes scienter in that it is clear from the overt, wanton, and malicious conduct of the Defendants said actions were all

designed to divest George of his stock ownership;

d. The Defendant attorneys, by improperly acquiring possession of Share Certificate Nos. 125 & 126, did so to further the intent of the conspiracy to take control of JACK'S TOURS from George;

e. As a consequence of the actions of the conspirators, George has sustained substantial pecuniary damages, in an amount to be proved at trial;

f. The conduct of the conspirators was willful, wanton, and engaged in with callous disregard for the rights and sensibilities of George and George is entitled to an award of punitive damages.

(Emphasis as appears in the Complaint.)

■ The Hawai'i Supreme Court has defined civil conspiracy as the "combination of two or more persons or entities by concerted action to accomplish **a criminal or unlawful purpose,** or to accomplish some purpose not in itself criminal or unlawful **by criminal or unlawful means.**" *Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co.,* 91 Hawai'i 224, 252 n. 28, 982 P.2d 853, 881 n. 28 (1999) (emphasis added), *superseded by statute on other grounds as stated in Hawai'i Med. Ass'n v. Hawai'i Med. Serv. Ass'n, Inc.,* 113 Hawai'i 77, 148 P.3d 1179 (2006). The supreme court explained that "[c]ivil conspiracy does not alone constitute a claim for relief." *Id.* at 260 n. 44, 982 P.2d at 889 n. 44. In other words, concerted action is not enough. A civil conspiracy claim must include either that the alleged conspirators had a *criminal or unlawful purpose* for their concerted action or that the alleged conspirators used *criminal or unlawful means* to accomplish a lawful objective.

■ Here, George alleges that Roehrig conspired with Carol and Jeff to defraud him. The elements of fraud are: (1) false representations made by the defendant; (2) with knowledge of their falsity (or without knowledge of their truth or falsity); (3) in contemplation of plaintiff's reliance upon them; and

---

**23.** While various alternative scenarios for the transfer of Raymond's shares were possible within the terms of the Jack's Tours Bylaws, none of them are before this court.

(4) plaintiff's detrimental reliance. *See, e.g., Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989).[24]

█ After reviewing all of George's arguments and evidence regarding the conspiracy claim, including those presented in response to Roehrig's summary judgment motion, in George's appellate briefs, and at oral argument, there appears to be no evidence of a representation or misrepresentation that George relied upon to his detriment. The communications between Roehrig and Carol, even if they constituted a breach of Roehrig's duties to his client, were professional malpractice, not fraud. Roehrig, arguably wrongfully, took on the role of stakeholder of the stock certificates and refused to turn them over to his client. However, George has failed to identify representations made by Roehrig, Jeff, and/or Carol to induce George to agree to Roehrig's assumption of the stakeholder role. Instead, George alleges that he did not agree to Roehrig holding the stock certificates. As George rejected Roehrig's role as stakeholder, he cannot be arguing that he relied on representations that induced him to agree to this arrangement. In short, George's vague allegations of fraud and conspiracy are not legally sufficient. George failed to adduce evidence supporting each of the elements of an underlying criminal or unlawful purpose or means. Therefore, we conclude that the Circuit Court did not err in granting Roehrig's summary judgment motion on George's conspiracy claim.

### F. *Roehrig's Motion for Summary Judgment on Embezzlement and Breach of Fiduciary Duty*

█ Roehrig's motion for summary judgment based on George's allegedly admitted embezzlement and breach of fiduciary duty, like his motion for summary judgment on the HRPC and on the Bylaws, did not seek summary judgment by reference to any particular cause of action. Instead, in this motion, Roehrig argued that all of George's alleged injuries and damages were caused by George's own conduct-his allegedly admitted embezzlement from Jack's Tours and breach of fiduciary duty, presumably his duty to the other shareholders. Roehrig's motion was quite brief, the entire argument was stated as follows:

> George Miyashiro admitted that while he was President of Jack's Tours, Inc., he had the corporation _____.[25] George's trial expert, Thomas Ueno, co-authored a report which stated that _____ had been embezzled from the corporation. Had George not settled the Jack's Tours, Inc. lawsuit (Civil No. 99–151), he would ultimately have lost the presidency of the corporation, his directorship, and his stock in the company, and become liable to the corporation for his misconduct. None of this was the result of any act or omission

<hr/>

**24.** Section 551 of the Restatement (Second) of Torts also addresses liability for wrongful non-disclosure, or fraud by omission:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them[.]

However, George has failed to adduce any evidence that, for example, prior to the settlement in 97–402 and 97–471, Roehrig conspired with Carol and/or Jeff to misrepresent Carol's consent to the transfer of Raymond's shares of stock in Jack's Tours to George. On the contrary, George has adduced evidence that Carol orally consented to the transfer, that Carol's consent was not reduced to writing before the settlement was placed on the record, and that Carol changed her mind after the settlement was recorded. Although we have concluded that the Bylaws do not require director consent, had the directors effectively consented to the transfer of Raymond's shares to George, it appears that this dispute would not have arisen. Nevertheless, there is no evidence in the record that material information was withheld from George prior to the settlement. George's conspiracy claim is not supported by any evidence of fraud by omission.

**25.** The allegedly admitted actions of embezzlement and breach of fiduciary duty were blacked out pursuant to a protective order.

of Stanley H. Roehrig. In a legal malpractice action, "where reasonable persons would not dispute the absence of causality ... the court may take the decision from the jury and treat it as a question of law." Accordingly, Roehrig is entitled to summary judgment in his favor and against George on all claims.

(Footnotes, citation, and brackets omitted.) [26]

■ On appeal, as in the court below, George argues that there were disputed issues of material fact regarding whether George embezzled money from Jack's Tours or breached a fiduciary duty. We agree. We begin by reviewing the meaning of embezzlement. Black's Law Dictionary states:

The elements of [embezzlement] are that there must be a relationship such as that of employment or agency between the owner of the money and the defendant, the money alleged to have been embezzled must have come into the possession of the defendant by virtue of that relationship and there must be an intentional or fraudulent appropriation or conversion of the money.

BLACK'S LAW DICTIONARY 522 (6th ed.1990), cited in State v. Borochov, 86 Hawai'i 183, 190 n. 5, 948 P.2d 604, 611 n. 5 (App.1997).

It is undisputed that money belonging to Jack's Tours came into George's possession. The dispute in this case concerns whether there was an intentional or fraudulent appropriation or conversion of that money. Roehrig presented expert testimony that over $1.3 million dollars had been embezzled from Jack's Tours over a number of years. George presented excerpts of testimony from the same experts, wherein the experts stated that it was unclear who took the moneys or received the moneys. George's expert witness testified, inter alia, that "[w]e did not find any evidence of embezzlement by George[.]" In a sworn declaration, George denied embezzling money from Jack's Tours and averred that he was advanced cash from Jack's Tours, a twelve-million-a-year business, on a recurring basis for the purpose of "wining and dining" tour agents.

A party that moves for summary judgment has the burden "to show the absence of any genuine issue as to all material facts, which, under applicable principles of substantive

**26.** Roehrig substantially and substantively expands this no-causation argument in his appellate brief, arguing: (1) the primary reason George settled 99–151 was to avoid further discovery of his misdeeds; (2) George caused his own losses related to his interest in Jack's Tours when he settled 99–151; (3) when the judge in 97–402 ordered Roehrig to turn the stock certificates over to George, the causal link between Roehrig's actions and George's damages was broken; (4) Judge Nakamura caused Roehrig to testify at the April 1999 hearing in 99–151; (5) Roehrig did not cause Carol's change of position regarding her consent to Raymond's transfer of the stock to George; (6) Roehrig's failure to assert promissory estoppel against Carol either was not malpractice or otherwise did not matter, under the circumstances of the case; and (7) George's damages are that he did not get away with fraud, which is not a legally cognizable basis for damages. Basically, Roehrig argues that we should affirm the summary judgment based on George's allegedly admitted embezzlement and breach of fiduciary duty on different grounds than presented in the motion. It is not the role of this court to entertain new summary judgment motions on appeal. Indeed, even if we were to consider affirming this particular summary judgment order on "alternate grounds," it appears from the record that genuine issues of material fact exist regarding additional reasons ## 1–3 & 6. Although we agree with the premise of additional reason # 4, that Judge Nakamura

caused Roehrig to testify, this is only a limited part of Roehrig's alleged breach of his duties to George and is addressed by this court's affirmance in part of the summary judgment on the HRPC. Similarly, there appears to be genuine issues of material and disputed facts surrounding Carol's withdrawal of her consent to the stock transfer to George (additional reason # 5) and, as discussed in conjunction with this court's ruling on the summary judgment on the Bylaws, genuine issues of material fact as to whether Roehrig's legal services fell below the standard of care owed to George in conjunction with the corporate approval issues related to the settlements in 97–402 and 97–471. Finally, regarding additional reason # 7, we agree that I-did-not-get-away-with-fraud is not a legally cognizable basis for damages. However, it appears, inter alia, that there was substantial overlap between the embezzlement claims brought against George in 97–402, which were dismissed with prejudice, and the embezzlement claims brought against George in 99–151. Issues related to the 99–151 suit, evidence in the record of this case, and the reasonable inferences therefrom, raise questions of law not presented to either the Circuit Court or this court, and raise genuine issues of material fact regarding George's reasons for and the impact of the settlement of 99–151 on George's claims for damages.

law, entitles the moving party to judgment as a matter of law." *Jou v. Dai–Tokyo Royal State Ins. Co.*, 116 Hawai'i 159, 164, 172 P.3d 471, 476 (2007) (block format and citation omitted). The burden has two components:

First, the moving party has the burden of producing support for its claim that: (1) no genuine issue of material facts exists with respect to the essential elements of the claim or defense which the motion seeks to establish or which the motion questions; and (2) based on the undisputed facts, it is entitled to summary judgment as a matter of law. Only when the moving party satisfies its initial burden of production does the burden shift to the non-moving party to respond to the motion for summary judgment and demonstrate specific facts, as opposed to general allegations, that present a genuine issue worthy of trial.

Second, the moving party bears the ultimate burden of persuasion. This burden always remains with the moving party and requires the moving party to convince the court that no genuine issue of material fact exists and that the moving part [sic] is entitled to summary judgment as a matter of law.

*Id.* (quoting *French v. Hawai'i Pizza Hut, Inc.*, 105 Hawai'i 462, 470, 99 P.3d 1046, 1054 (2004)).

Even if we were inclined to view Roehrig's evidence more favorably than George's, we are reviewing the entry of summary judgment on this issue. It appears from the record of this case that genuine issues of material fact exist on this issue. Indeed, even if George had misappropriated money from Jack's Tours, it does not appear from the record that he necessarily would have been removed as president of the company and otherwise would have been divested of his interest in the company. We cannot conclude, as a matter of law, that there is a complete absence of causality between Roehrig's alleged breaches and the damages allegedly suffered by George.

For these reasons, we conclude that the Circuit Court erred in granting summary judgment based on embezzlement and breach of fiduciary duty.

### G. Attorneys' Fees and Costs

In light of our rulings on the summary judgment orders and the remand of the case for a trial on the merits of George's remaining claims, we vacate the Circuit Court's April 17, 2007 order awarding RRWH, Roehrig, and Hara attorneys' fees and costs. Accordingly, we will not otherwise address the issues and arguments related to the award of attorneys' fees and costs.

## V. CONCLUSION

For the foregoing reasons, the Circuit Court's April 24, 2007 Second Amended Final Judgment is affirmed in part and vacated in part. We remand this case to the Circuit Court for further proceedings consistent with this Opinion.